UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,                  :

       -against-                                        :         16 Cr. 760 (RMB)

AHMAD KHAN RAHIMI,                             :         AFFIDAVIT

       Defendant.                                    :

------------------------------------------------------------x

       I, AHMAD KHAN RAHIMI, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

    1.    I am Ahmad Khan Rahimi.

    2.    I am the defendant in the above-captioned case and currently reside at the Metropolitan Correctional Center, 150 Park Row, New York, New York 10007.

    3.    I am 29 years-old.

    4.    I make this affidavit on personal knowledge.

    5.    I make this statement in support of an omnibus motion seeking, among other things, to suppress statements I made to law enforcement in September 2016, and statements and hair evidence taken from me, on December 28, 2016. As this statement is being made for a limited purpose, I do not state every detail of what happened, to the extent that I recall the events described.

    6.    I am represented in the above-captioned case by David Patton, Peggy Cross-Goldenberg, and Sabrina Shroff of the Federal Defenders of New York, Inc. ("Federal Defenders").

7. I am also represented by Alexander Shalom of the American Civil Liberties Union in *United States v. Rahami*, 16-3594 (D.N.J.).

8. I am also represented by Peter Liguori of the New Jersey Office of the Public Defender in a separate criminal proceeding in the State of New Jersey.

## September 2016

9. On September 19, 2016, in the early morning, I was sleeping in the doorway of a business in Linden, New Jersey. I was awoken and subsequently shot by police officers in the back and other areas of my body, and I recall dropping to the ground.

10. Shortly thereafter, I was handcuffed by police. I could not breathe and tried to yell for help. I tried to sit up, because I thought that it would help me breathe. However, when I tried to do so, I felt excruciating pain in the front and back of the upper-right area of my body. I was spitting blood, and blood was coming out of other parts of my body.

11. I was then moved on a stretcher and put into an ambulance where two people gave me medical treatment. My eyes would close, and I would be jolted by people telling me to wake up.

12. I later learned that I was taken to University Hospital in Newark, New Jersey. Other than the information contained paragraph 11, I do not remember anything else about the ride to the hospital. For example, I do not recall when I arrived at the hospital or what happened when I got there.

13. I am told that, during the period of September 27-29, 2016, I was being treated for multiple gunshot wounds in my back, abdomen, right arm (which I use to write), left hand, and other areas of my body.

14. The next event I recall is waking up in a hospital bed. I do not recall when I woke up. I vaguely recall hearing two voices, but I was unable to respond to them. Everything was blurry. I recall falling asleep and waking up.

15. On another occasion, I recall that I woke up in response to hard pressing on my chest. Three other people whom I had never seen before were standing next to my bed with a doctor. The three people (two men and one woman) identified themselves as agents from the Federal Bureau of Investigation ("the Agents"). I do not recall whether the Agents told me their names, nor do I recall who else, if anyone, was standing next to my bed. I do not recall how much time passed between the first time I woke up, as discussed in paragraph 14, and the first time the Agents appeared in my room.

16. I had no peripheral vision. I could not move my head. I could only see shapes out of the corner of my eyes. Objects and people appeared round and distorted. As a result, I am unable to describe any of the Agents.

17. The only thing I remember about the Agents' first visit is that they asked me questions about my family members. The Agents asked me about my older brother, my younger brother, and my sisters, specifically referring to them by name. I do not recall the questions that the Agents asked me.

18. When the Agents questioned me, I felt scared and anxious.

19.     I recall the Agents coming in and out of my hospital room periodically over the next several days or weeks.  It seemed like they were coming in often, *i.e.*, every day for one or two weeks.  Days blend in my memory, and I cannot distinguish one day of questioning from the next.

20.     On some occasions, I would wake up naturally to find the Agents standing over me, and then they would begin to ask me questions. On other occasions, I would feel a push or pressure.  The pressure would wake me, and I would find the Agents there next to my bed.  They would then begin questioning me.

21.     I also recall that, on one of the occasions they came to my room, the Agents told me that they had previously been in the room, asked if I remembered them, and told me that they wanted to ask me questions.  I could not be certain that these three individuals were the same people who had come to ask me questions the first time, as described in paragraph 15, because my vision was so blurry, and I was having difficulty seeing faces.

22.     When the Agents asked me these questions, I had a breathing tube down my throat.  Because I could not speak, the Agents would sometimes hold a piece of paper containing the alphabet in front of my face.  I could not see the letters clearly. They appeared blurry and distorted.  I have no recollection as to how I answered their questions.

23.     I believe that a doctor was in the room on one occasion when the Agents asked me questions, but I do not recall whether he or she said anything.  I do not

recall anyone else being in the room with the Agents and me (including family, friends, or an attorney), on any of the other occasions that they asked me questions.

24. I was having frequent episodes where I would completely black out and then return to being extremely groggy. I would not know where I was or would think that I was in an entirely different place.

25. When awake, I felt extreme fatigue in my body and would then lose consciousness. I also recall that I had several IVs, a breathing tube, a catheter, and was restrained to the bed. I could barely move my head, and I was unable to see clearly.

26. I do not recall the Agents telling me what the date was, the name of the hospital I was in, or information about my medical condition.

27. I do not recall the Agents telling me that I was under arrest.

28. I do not recall the Agents ever giving me the "*Miranda* Warnings" before asking me questions.

29. I do not recall the Agents ever asking me to sign anything, nor do I recall signing or writing anything when the Agents asked me questions.

30. I do not recall the Agents ever telling me that an attorney tried to represent me.

31. I have been told that I was hospitalized in University Hospital for approximately one month. I recall that, until about a week before I was discharged, in October 2016, I still had a breathing tube and was being fed intravenously. It was

not until my last week in the hospital that I began to drink liquids.  I never ate any solid food during the time I was in the hospital.

32.   If I had been in my right mind and understood what was happening when the agents were in my room, I would not have spoken to them without an attorney.

## December 2016

33.   On December 28, 2016, I was a resident of cell five on the unit known as "10 South" at MCC.

34.   That morning, I was informed by a Correctional Officer ("C.O.") whom I know by the name "Q" (hereinafter "C.O. Q") that I would be moving from cell five to cell four in accordance with MCC policy requiring cell rotation for inmates housed on 10 South every twenty-one days.  I packed my belongings and completed the move by 11:00 a.m.

35.   At approximately 11:00 a.m., I was in cell four unpacking my belongings when I was approached by Lieutenant ("Lt.") Lopez, who asked me if C.O. Q had informed me that MCC Receiving and Distribution ("R&D") had called for me.  I informed Lt. Lopez that I had not been told that R&D had called for me.  Lt. Lopez replied, "Alright," and left my cell.  Because I had been receiving physical therapy for injuries to my hand, I assumed that R&D was summoning me to go to physical therapy.

36. I continued to unpack my belongings. Lt. Lopez returned to my cell approximately one half-hour later, around 11:30 a.m. to inform me that R&D had called again and someone would be taking me to the third floor.

37. Shortly thereafter, Lt. Lopez, C.O. Q, and another C.O. escorted me to the back room of R&D on the third floor. I was immediately directed to the changing room where I typically change clothes before being taken for court appearances. I therefore thought that I had been brought to R&D to change my clothes in preparation for a court appearance, rather than to attend physical therapy.

38. Lt. Lopez, C.O. Q, and the other C.O. remained in the changing room with me, and one C.O. from R&D joined them. They did not instruct me to strip out as they typically would when I am asked to change clothes for a court appearance.

39. Approximately one-to-two minutes later, around 11:45 a.m., a man entered the back room where I was waiting with Lt. Lopez and the officers.

40. The man was wearing a suit and tie. He did not have a badge or any other identification or items displayed on his jacket, shirt, or waistband. I do not recall whether he was wearing a visitor pass/badge like those I have seen clipped to attorney's clothing when they visit me at MCC.

41. I did not recognize the man and, to the best of my recollection, I had never seen him before that day. I later learned from one of my attorneys, Ms. Sabrina Shroff, that the man was a federal agent working for the Federal Bureau of Investigation ("FBI") (hereinafter "the Agent"). However, I did not learn this

information until after my interactions with the Agent on December 28, 2016, concluded.

42. When the Agent entered the back room, he shook my hand. He did not tell me his name, who he was, or why he was there. The Agent said only, "Hi, how is everything going?" I replied, "Alright."

43. The Agent then asked, "Did Sabrina tell you I was coming?" I replied, "No, she never mentioned it." When the Agent asked me this question, I understood him to be referring to my attorney, Sabrina Shroff, who visits me regularly at the MCC. Based on the manner in which the Agent asked me this question and his apparent familiarity with Sabrina (because he called her by her first name), I understood him to have been sent by Sabrina or someone from her office to meet with me.

44. The Agent then asked me, "How are you doing with discovery?" In response, I told the Agent that I had been able to review some of the discovery, but had been unable to review other portions. When the Agent asked me this question, I answered because I understood him to have been sent by Sabrina or her office, and it was natural that she would be inquiring about my progress in reviewing discovery that she had sent to me for my review at MCC.

45. The Agent replied that I should not worry, because I would be sent "the most important materials" that I needed to review later in the week. When the Agent made this statement, I again understood him to have been sent by Sabrina or her office and believed that he was relaying a message from her that I would be sent "the

most important discovery" materials that I should review. It is normal for Sabrina to send someone from her office to see me who would ask questions about discovery or similar matters, because sometimes Sabrina comes to the MCC to see me herself and sometimes she sends others from her office to see me. I assumed the Agent was from Sabrina's office when he mentioned my discovery because, around this time in my case, we had been regularly discussing our progress in reviewing my discovery with the judge. It therefore was not unusual for someone from Sabrina's office to come and talk to me about discovery like the Agent did.

46. I also thought that the Agent had been sent by Sabrina because she had visited me about three days prior and said that she would be coming to see me with Mr. Liguori on December 28, 2016. When the Agent asked me if Sabrina had told me he was coming, I figured that Sabrina had simply forgotten to tell me that the Agent would also be coming on December 28th.

47. The Agent then informed me that he was going to take a hair sample from me. He stated that he "just needed a couple of strands" of my hair. Because his conversation with me started by his mention of "Sabrina," I assumed that she had sent him to take a hair sample and that he was working on her behalf.

48. In response, I asked the Agent, "What's the need for the hair sample?" and he explained that it was supposed to have been taken earlier, but that it had not been.

49. As the Agent discussed the hair sample, as described *supra* at ¶¶ 47-48, he began to collect the sample from me.

50. First, the Agent tried to obtain the sample from the hair on my head by using plastic tweezers. He was apparently unable to do so, because he ultimately did not remove any hair from my head. At that time, I had just cut my hair and beard, which were short.

51. The Agent then tried to take a hair sample from my beard. The Agent proceeded to pluck numerous hairs from my beard using a pair of plastic tweezers. He placed the hair sample in a small envelope.[1] The Agent then checked the hair sample he had placed in the envelope and stated, "This should be good enough."

52. In total, it took the Agent approximately six-to-seven minutes to obtain the hair sample.

53. The Agent again informed me that I would be receiving "the most important discovery material soon." When the Agent made this statement, I once again understood him to be speaking for Sabrina and my other attorneys at the Federal Defenders, and to mean that the Federal Defenders Office would be sending me further discovery materials that I should review. I replied, "Okay, have a good day."

54. At approximately 12:00 p.m., the Agent left the room. He did not return.

55. In sum, my interactions with the Agent—from the time he entered the back room of R&D on the third floor to the time he left the room after taking the hair sample from me—lasted approximately ten minutes.

---

[1] The Agent did not obtain any hair samples by combing my beard.

56. Not once during my interactions with the Agent on December 28, 2016, did he identify himself as working for the U.S. government, the FBI, or any other federal agency.

57. Not once during my interactions with the Agent on December 28, 2016, did the Agent show me any papers related to the hair sample (or any other matter).

58. Lt. Lopez and the three officers remained in the back room for the entirety of the time that the Agent was present. I did not say anything to them about the Agent or hair sample at any time. They did not say anything to me about those topics at any time or to one another in my presence.

59. At approximately 12:00 p.m., I was escorted back to my cell by Lt. Lopez, C.O. Q, and the other C.O.

60. Later that afternoon, I received a legal visit from Sabrina and Mr. Liguori.

61. During the meeting, I asked Ms. Shroff, "Who was the guy you sent to see me earlier today?" Sabrina seemed puzzled by my question and asked me, "What guy are you talking about?" Referring to the Agent, I explained, "The guy who you sent to take a DNA sample."

62. When Sabrina indicated that she did not know to whom I was referring, I explained that, earlier that day, I had been taken from my cell to the back room of R&D on the third floor and that, while there, a man I had never seen before arrived and took a hair sample from my beard. I also explained that I believed that the man had been working for Sabrina and the Federal Defenders to obtain the hair sample

in connection with their representation of me, because he had asked me if "Sabrina" had told me he was coming.

63.     Sabrina told me that neither the Federal Defenders nor Mr. Liguori's office had sent anyone to see me that day to obtain a hair sample.

64.     This was the first time that I learned that the Agent was working for the U.S. government or FBI.  During the entirety of my interactions with the Agent on December 28, 2016, and until Sabrina told me otherwise, I believed that the Agent was working for Sabrina and my attorneys at the Federal Defenders based on his statements to me, including his question regarding whether "Sabrina" had told me he would be coming.  I therefore believed that the Agent had taken the hair sample at the request of Sabrina and my attorneys at the Federal Defenders, for their use in defending my case.  Until Sabrina informed me otherwise, I did not know that the Agent was not employed by, nor affiliated with, Sabrina or the Federal Defenders.

65.     The sole and exclusive reason I provided the hair sample to the Agent was because I believed that he was working for Sabrina and my attorneys at the Federal Defenders and that the sample was being taken in the connection with their defense of my case.

Dated: New York, New York
       May 3, 2017

*Ahmad K. Rahimi*
AHMAD KHAN RAHIMI