HAC9RAH1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        16 CR 760 (RMB)

5    AHMAD KHAN RAHIMI,

6              Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        October 12, 2017
9                                       9:25 a.m.

10

     Before:
11
                    HON. RICHARD M. BERMAN,
12
                                        District Judge
13                                        and a jury

14                         APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     EMIL BOVE
17   ANDREW DeFILIPPIS
     SHAWN CROWLEY
18        Assistant United States Attorneys

19

20   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
     SABRINA SHROFF
21   MATTHEW LARSEN
     MEGHAN GILLIGAN
22   RACHEL MARTIN

23   ALSO PRESENT:  Special Agent Joanna Maroudas, FBI
     Paralegal Ayushe Misra, U.S. Attorney's Office
24   Paralegal Dante O'Connell, Federal Defenders of NY
     Investigator Anna Finkel, Federal Defenders of NY
25
```

HAC9RAH1

1                    (Trial resumed; jury not present).

2                    THE COURT:  Thanks.  Please be seated.  We're going to

3        get the jury in just one minute.

4                    While we're waiting for the jury I just want to put

5        one note on the record.  Somebody asked me from the public

6        about the question of the dumpster.  So I looked back in the

7        transcript.  The dumpster was actually approved as coming into

8        evidence on October 3, not on October 5 where I think it was

9        reported.  And, in fact, I think we even discussed it earlier

10       than that.  But in the transcript itself of October 3 it is

11       presented that the government wishes to introduce the dumpster.

12       Defense objected.  And I said I would allow the dumpster in.

13       So that's the latest date that that was approved.  I just

14       wanted to clear that up.  Ready?

15                    (Continued on next page)

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HAC9RAH1                         DeFusco - direct

1            (Jury present)

2            THE COURT:  We're going to pick up.  I think we were

3    at the cross-examination of Agent DeFusco or was there still

4    some direct?

5            MS. CROWLEY:  I have a little bit of direct left,

6    Judge.

7            THE COURT:  Okay.

8    DAVID P. DEFUSCO, resumed.

9            THE DEPUTY CLERK:  Sir, before we begin I'd like to

10   remind you, you're still under oath.

11           MS. CROWLEY:  May I proceed?

12           THE COURT:  Yes.

13           MS. CROWLEY:  Thank you, your Honor.

14   DIRECT EXAMINATION CONTINUED

15   BY MS. CROWLEY:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Before we broke yesterday I think we were talking about the

19   Elizabeth devices that you analyzed and I believe you testified

20   that you analyzed six devices from the Elizabeth scene?

21   A.  That is correct.

22   Q.  And that one of those devices was functioning during the

23   render-safe procedure in Elizabeth and the remaining five were

24   rendered safe at the FBI laboratory?

25   A.  That is correct.

HAC9RAH1                    DeFusco - direct

1    Q.  Were you involved in that render-safe procedure?

2    A.  Yes, I was.

3    Q.  Could you describe how that procedure played out?

4    A.  Just in brief, the five devices that were still intact were

5    transported to the FBI academy where we have facilities to

6    disassemble devices remotely.  So in that process we were able

7    to utilize tools to remotely render them safe.  And by saying

8    that I mean we separate the fusing system from the explosive

9    main charge making it safe to collect that evidence so I can

10   take it to the laboratory and conduct our normal forensic

11   examinations.

12   Q.  And was explosive material collected from each of those

13   five devices?

14   A.  Yes.

15   Q.  Where was the explosive material in each of those devices?

16   A.  They were contained inside of each of the containers.

17   There were four containers that consisted of a water bottle

18   container and one container that was a pipe, a galvanized pipe.

19   Q.  And was the explosive material that was removed from those

20   containers tested?

21   A.  Yes.  They were tested, yes.

22   Q.  And what did you do with the devices after they were

23   rendered safe?

24   A.  After we rendered them safe we packaged them and

25   transported them over to the FBI laboratory where we did our

HAC9RAH1                          DeFusco - direct

1    normal check-in notes, followed our normal standard procedures

2    for checking in evidence to the FBI laboratory.

3    Q.  I'd like to talk for a second about the analysis you

4    performed on the device that was rendered safe at the Elizabeth

5    scene.  What were the components of that device?

6    A.  Looking at the physical evidence that was submitted to the

7    laboratory, the components of that device consisted of an

8    explosive main charge that was identified by our explosive

9    chemists as the primary explosive HMTD.  The container for that

10   particular device was a PVC pipe fragments that I analyzed.

11   And the fusing system that was submitted was fragments of hobby

12   fuse which is a nonelectric fusing system or way to initiate an

13   explosive.

14            MS. CROWLEY:  Please publish Government Exhibits

15   409-1, 410-1, and 411-1.

16   Q.  Are these pieces of evidence that you examined that were

17   collected from Elizabeth?

18   A.  Yes.  These are items I examined.

19   Q.  What were they?

20   A.  My opinion these are items that are consistent with a white

21   colored PVC-type container.

22   Q.  So that was the container for one of the Elizabeth devices?

23   A.  Yes.

24   Q.  And I believe you mentioned that the explosive main charge

25   you identified or that was identified was HMTD?

HAC9RAH1                          DeFusco – direct

1   A.  Correct.

2   Q.  And the fusing -- what was the fusing system in this

3   device?

4   A.  The fusing system that was submitted to the laboratory were

5   fragments of green colored hobby fuse, a nonelectric fusing

6   system.

7          MS. CROWLEY:  Could we publish 412-1, 413-1 and 414-1.

8   Q.  What are these items?

9   A.  These are -- item 71, item 75, and item 76 are pieces of

10  fragmented pieces of green colored hobby fuse.

11         MS. CROWLEY:  Let's publish Government Exhibits 415-1

12  and 416-1.

13  Q.  Are these additional pieces of evidence you analyzed from

14  the device that was rendered safe on the scene of Elizabeth?

15  A.  Yes.  These are various metal objects that are consistent

16  with being fragmentation.  You have nuts and washers and things

17  of that nature.

18  Q.  So in your opinion was this fragmentation necessary for

19  that device to function?

20         MS. SHROFF:  Objection.

21         THE COURT:  Overruled.

22         THE WITNESS:  It's not necessary for the IED to

23  function.  It's just added fragmentation that causes it to be

24  more dangerous when it explodes.

25  Q.  Agent DeFusco what, if anything, did you conclude about how

1  this first device was configured to detonate?

2  A.  In its original configuration prior to the render-safe

3  attempt, it was a PVC-type container that confined the main

4  charge explosive.  The electrical fusing system would have been

5  the hobby fuse.  And that hobby fuse would have been inserted

6  inside the container.  So when you light or initiate the one

7  end of the hobby fuse you're going to have a consistent flame

8  that's going to burn through the hobby fuse.  That flame will

9  enter inside the container.  Once that flame enters inside the

10  container and comes in contact with the HMTD you're going to

11  have a violent explosion.

12  Q.  What, if anything, did you conclude about how this device,

13  in fact, detonated?

14  A.  It detonated during the render safe or it exploded during

15  the render-safe procedure while bomb technicians were

16  attempting to separate the main charge explosive from the

17  fusing system, basically removing the explosives from the

18  container.

19  Q.  And what was the reaction that caused that detonation in

20  your opinion?

21  A.  My opinion, speaking with the bomb technicians on the scene

22  and reading some reports following up, the technique that they

23  used, they tried to use a device to crush the end of the cap,

24  to pop it off to open it so you can pour the explosives out.

25  During that process when they were using that device and it

HAC9RAH1                    DeFusco - direct

1    clamped, it may have caused sufficient friction or heat which

2    caused it to function or caused it -- the energetic material to

3    explode.

4    Q.  Okay.  You testified that you also analyzed devices made

5    from water bottles; is that correct?

6    A.  That is correct, yes.

7    Q.  And how many water bottle devices did you analyze?

8    A.  There were four total.

9    Q.  And, again, those were rendered safe at the FBI laboratory?

10   A.  Yes.

11        MS. CROWLEY:  Let's publish Government Exhibit 417-1A.

12   Q.  Is this a photograph of one of the water bottle devices you

13   rendered safe and analyzed?

14   A.  Yes.  This is a photograph after the render-safe procedure.

15   This photograph was taken during the checking portion of our

16   analysis.  You can see a container on the right that has been

17   wrapped in tape.  And on the left side you have green color

18   hobby fuse that is protruding through the cap of the water

19   bottle.  That cap had a hole in the top, which we call a

20   priming hole.  That's a hole that is drilled in there or cut in

21   there to allow a fusing system to enter inside the container.

22   Q.  And was an explosive main charge identified for this

23   device?

24   A.  Yes.  An explosive was identified.  It was a mixture of a

25   low explosive, an improvised black powder, and a high

HAC9RAH1                    DeFusco - direct

1    explosive, primary explosive known as HMTD.

2    Q.  And that was inside this water bottle?

3    A.  It was inside the container, yes.

4    Q.  So what, if anything, did you conclude about how this

5    device was configured to function?

6    A.  Again, it would function.  You have the container.  The

7    fuse would be inside the container, mixed in intimate contact

8    with the explosive main charge in the inside.  You light the

9    fuse on one end, the hobby fuse on one end.  Again, that flame

10   will transmit through that fuse into the container.  Once it

11   goes into the container you will have energetic reaction and an

12   explosion will take place.

13   Q.  And with respect to the three remaining water bottle

14   devices that you rendered safe and examined, did those consist

15   of similar components as those you identified here?

16   A.  Yes.  They were all consistent with one another.

17   Q.  Were they the same?

18   A.  They were -- they were similar; the same water bottle

19   construction, same type of tape, same type of hobby fuse and

20   same type of explosive.  So they were all similar, yes.

21   Q.  Do they all contain the HMTD black powder mixture inside?

22   A.  Yes, according to our explosive chemists' reports, yes.

23   Q.  With respect to all four of these water bottle devices,

24   besides ignition through the hobby fuse, could these water

25   bottle devices have detonated in any other way?

1           MS. SHROFF:  Objection.

2           THE COURT:  Overruled.

3           THE WITNESS:  Again, these are very dangerous items.

4           MS. SHROFF:  Objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  They are filled with a very sensitive

7    primary explosive and a very sensitive improvised low

8    explosive.  So, yes, they are susceptible to heat, friction,

9    impact, anything like that could cause it to go off.

10   Q.  So if these devices, in your opinion, if these devices had

11   been propelled or thrown, could that have caused them to go

12   off?

13          MS. SHROFF:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  There is a potential.  Yes.  Absolutely.

16   I would not want someone to throw that device at this wall

17   behind me as I'm sitting here.

18   Q.  Let's talk about --

19          MS. SHROFF:  Objection, your Honor.

20          THE COURT:  Overruled.  That's four objections to the

21   same question.

22   Q.  Let's talk about the final device that you analyzed from

23   Elizabeth.  What was that device comprised of?

24   A.  That was a galvanized pipe elbow, refer to it as a pipe

25   elbow.

HAC9RAH1                        DeFusco - direct

1                MS. CROWLEY:  Let's publish Government Exhibits 423-1D

2      and 423-1E.

3      Q.  Are these photographs of the sixth device you analyzed from

4      Elizabeth?

5      A.  That's correct.  This is after the render-safe portion of

6      what we did.  This is at the point we were checking into

7      evidence.

8                You can see here on the left photograph there is the

9      galvanized pipe wrapped in tape.  There was a hole drilled into

10     the side of the metal container to allow a -- a primer hole to

11     allow the hobby fuse to enter.  And the explosive main charge

12     was already removed when this picture was taken.

13     Q.  And what was the explosive main charge in this device?

14     A.  This one was identified as an improvised black powder.

15     Q.  When you say improvised, what do you mean?

16     A.  It was not a commercially made black powder.  So it was

17     not -- according to our explosive chemists' reports it was not

18     a black powder that was purchased from a store.  It was

19     improvised or homemade.

20     Q.  What, if anything, did you conclude about how this device

21     was configured to function?

22     A.  This device was configured to function.  You have the

23     explosive main charge in the inside that was susceptible to

24     heat, shock, friction.  You had a nonelectric fusing system

25     that was entering through that priming hole.  Again, you light

HAC9RAH1                        DeFusco - direct

1    the green hobby fuse.  That flame transmits through that hobby

2    fuse.  As soon as that flame enters inside of that container,

3    you're going to have an energetic reaction of that low

4    explosive.  It's going to burn.  It's going to produce those

5    gases.  Those gases are going to increase in pressure to the

6    point where the metal container is going to fracture.  It's

7    going to explode in all directions.

8    Q.  Agent DeFusco, you testified that the 27th Street device

9    and the four water bottle devices from Elizabeth contained both

10   black powder and HMTD; is that correct?

11   A.  That is correct.

12   Q.  And are those high explosives or low explosives?

13   A.  The black powder is a low explosive and the HMTD is a high

14   explosive, a primary high explosive.

15   Q.  Now in your 16 years with the FBI have you ever seen this

16   combination of explosive materials used in an IED before?

17   A.  Personally, I have never seen the combination of the two

18   together.  I have seen black powder on its own and I have seen

19   HMTD on its own.  But I've never seen the two of them combined,

20   an improvised low explosive and at a very sensitive high

21   explosive, combined in the same main charge.  In my experience

22   I've never seen it.

23   Q.  And you testified yesterday that it was your opinion that

24   the 27th Street device was likely configured to ignite

25   through an electric fusing system; is that right?

1              MS. SHROFF:  Objection to the leading.

2              THE COURT:  Overruled.

3              THE WITNESS:  That is correct.

4    Q.  And can you remind us what that electric fusing system was

5    comprised of?

6    A.  For the 27th Street device it consisted of an electrical

7    fusing system.  And we'll go over the four parts of an

8    electrical fusing system again.  A power source, the first

9    thing, was part of the cellphone battery provided the power.

10   The switch in that electrical fusing system was the modified

11   cellular telephone that was modified by removing the vibratory

12   motor and attaching the wires to that contact point.

13              There were wires present.  They are the conductors.

14   That's the third element of your fusing system.  So you had a

15   pathway for the electricity to flow.

16              And that final part of an electrical fusing system is

17   your initiator.  And that's where we had the modified Christmas

18   tree lightbulb that is capable of initiating a low explosive or

19   a primary high explosive.

20   Q.  Now, in your opinion, besides ignition through that

21   electric fusing system, could anything else have caused the

22   27th Street device to explode?

23   A.  Again, very dangerous configuration.  You have a mixture of

24   a improvised low explosive combined with a high explosive

25   primary inside of a container.  Again, these types of

HAC9RAH1                         DeFusco – direct

1    explosives are very sensitive to heat, shock, friction.  So any

2    type of movement like that or unnecessary movement can cause it

3    to explode.  If you provide that stimulus, whether it's an

4    impact, it does have a potential to explode.  As a bomb

5    technician I would not, even if you removed that electrical

6    fusing system, I certainly would not go up to that container

7    with a lid on it and try and remove that container by hand

8    because just the simple moving of the container, the friction

9    that you may create from the metals, if you have any of that

10   product on that area there is a potential.

11          It may not happen every time.  I liken it to the

12   analogy of a cobra.  I'm not going to go up and smack a cobra

13   in the head ten times in the face.

14          MS. SHROFF:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  You may get away with it three or four

17   times, but on that fifth time it may come out and bite you.  So

18   it's a very dangerous, in my opinion, it's a very dangerous

19   item.

20          MS. CROWLEY:  One moment, your Honor.

21          Nothing further.  Thank you.

22          MS. SHROFF:  We have no cross, your Honor, but we

23   would ask for a sidebar.

24          THE COURT:  Okay.

25          (Continued on next page)

1           (At the sidebar)

2           MS. SHROFF:  As you noted, and I objected throughout

3    his testimony given the repetitive nature of the testimony, the

4    definitional question such as the definition of improvised, low

5    explosive, high explosive, asked over and over again, at least

6    twelve times or more.

7           THE COURT:  Which question was asked twelve times?

8           MS. SHROFF:  I can actually give you a count if you'd

9    like at some point.

10           THE COURT:  Tell me one question that was asked twelve

11    times.

12           MS. SHROFF:  I think the definition of low explosive

13    and high explosive was asked --

14           THE COURT:  Twelve times?

15           MS. SHROFF:  I think so, but I could be wrong in my

16    count.

17           THE COURT:  I think you might be.

18           MS. SHROFF:  The same thing for what is improvised.

19           THE COURT:  Is that the objection?

20           MS. SHROFF:  Yes, your Honor.

21           THE COURT:  Repetition?

22           MS. SHROFF:  No, no.  Not just repetition.  Also that

23    essentially there was no firsthand testimony.  He testified

24    about what other people in his unit had done.

25           THE COURT:  So now we're rearguing the question of

HAC9RAH1                         DeFusco – direct

1    whether he should be called as an expert.  I've already ruled

2    on that.  He's been testifying as an expert.  Your objection is

3    noted to calling him.  And it's noted again.

4             MS. SHROFF:  And I'm just pointing out at the end of

5    the testimony that all of the evidence he presented to the jury

6    is cumulative and that had been based on all the other people

7    that had worked in the unit.

8             THE COURT:  You'd have to be more specific than that.

9             MS. SHROFF:  Certainly, your Honor.  So he testified

10   about what Mcfarlane did and he didn't do any work on the

11   chemistry part.

12            THE COURT:  That's enough of this.  If you want to put

13   in a letter, the number of times each question twelve times.

14            MS. SHROFF:  I just wanted to make the objection to

15   your Honor.

16            THE COURT:  Good.  Thanks.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  So thanks very much, Mr. DeFusco.  You're

3    excused.  We're going to have the next government witness.

4          (Witness excused)

5          MS. CROWLEY:  Your Honor, the government calls Tsitsi

6    Merritt.

7    TSITSI MERRITT,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10         MS. CROWLEY:  May I inquire, your Honor?

11         THE COURT:  Sure.

12   DIRECT EXAMINATION

13   BY MS. CROWLEY:

14   Q.  Good morning, Ms. Merritt.

15   A.  Good morning.

16   Q.  If I could just ask you to speak into the microphone so the

17   court reporter can hear.  Thank you.

18   A.  Sure.

19   Q.  Where do you live?

20   A.  Harlem.

21   Q.  And where are you from?

22   A.  Zimbabwe.

23   Q.  Are you still a citizen of Zimbabwe?

24   A.  Yes.

25   Q.  What do you do for a living?

HAC9RAH1                          Merritt - direct

 1  A.  I'm a registered nurse.

 2  Q.  Do you have any children?

 3  A.  Yes.

 4  Q.  How many?

 5  A.  One.

 6  Q.  And is it a son or a daughter?

 7  A.  Son.

 8  Q.  How old is your son?

 9  A.  Eleven.

10  Q.  Ms. Merritt, I'd like to direct your attention to

11  September 17, 2016.  Do you recall what you were doing that

12  evening?

13  A.  Yes.

14  Q.  Could you tell -- could you describe it for us.

15  A.  I was on my way with my friend in her car.  I was a

16  passenger.  And my son was in the backseat.  And we were on our

17  way to Bed Bath & Beyond because we wanted to buy an airfryer.

18          We got turned around.  We were actually -- we got

19  lost.  We couldn't make a left or a right, so we could only

20  make a U-turn.  So we made the -- we went to go down to Fifth

21  Avenue and turned right back on -- we were still on west -- on

22  23rd.  And when we were waiting on the traffic light when --

23  Q.  And what happened?

24  A.  Then we heard like a loud sound.  And the car we were in

25  like kind of jumped and was shaking.  What I would relate to as

1    an earthquake.  We heard people running and screaming.  And we

2    were not really sure like what it was.

3    Q.  And did anything happen to the car?

4    A.  Yes.

5    Q.  What happened?

6    A.  The windows -- my son was in the backseat.  The backseat

7    windows shattered onto him.  And some of the -- the rearview

8    mirrors was also damaged.  And I'm not sure all the damage that

9    was to the car.

10   Q.  What kind of car was it?

11   A.  It was a Toyota.

12   Q.  What color?

13   A.  White.

14   Q.  After the car shook did you talk to your son?

15   A.  Yes.

16   Q.  And was he able to respond to you?

17   A.  No.

18   Q.  I'm sorry?

19   A.  No.

20          MS. CROWLEY:  Can you publish Government Exhibit

21   1002-10.

22   Q.  Ms. Merritt, do you recognize any of the cars that you see

23   in this frame?

24   A.  Yes.

25   Q.  Which one?

HAC9RAH1                         Merritt - direct

1    A.  The white one.  The small white car.

2    Q.  In the back?

3    A.  Yes.

4    Q.  In the middle of the street?

5    A.  Yes.

6    Q.  And was that the car that you were in that night?

7    A.  Yes.

8              MS. CROWLEY:  We could play the video.

9              (Video played)

10             MS. CROWLEY:  You can take that down.

11   Q.  Take your time.

12   A.  I'm sorry.

13   Q.  That's okay.  Let me know if you're ready to proceed.

14   A.  Yeah.

15   Q.  Are you okay?

16   A.  Yes.

17   Q.  Ms. Merritt, we saw the car drive away after the windows

18   were knocked out.  Who was driving the car?

19   A.  Pauline, my friend.

20   Q.  And where did she drive to?

21   A.  She just drove over, past the traffic light because when

22   the explosion happened she was like in some sort of a daze.

23   And when I was calling her she was not really like answering me

24   or responding appropriately.  So I was just like just get out

25   of here because we're not sure what it was.  So she was able to

HAC9RAH1                         Merritt - direct

1    drive.  And then when we got to like I think it was like a

2    steakhouse then she just was -- she just stopped the car there.

3    She couldn't drive anymore.

4    Q.  And what did you do after she stopped the car?

5    A.  I was telling my son you're okay.  Just calm down.  You're

6    okay.  And I was trying to call her.  We then tried to call --

7    I think we actually called 911.  I'm not sure if it was my

8    phone or her phone.  And I also ran into the steakhouse and I

9    was trying to ask for help but it seems like nobody really

10   could understand.  They were just looking at me and nobody was

11   taking any action.  So I got back outside and that's when I saw

12   like the police and everybody else with -- they were running

13   eastbound, you know, towards where the explosion had happened.

14          MS. CROWLEY:  Can we publish Government Exhibit

15   202-29A.

16   Q.  Do you recognize this photograph?

17   A.  Yes.

18   Q.  Who is that?

19   A.  That's me.

20   Q.  And is that after you got out of the car?

21   A.  Yes.

22   Q.  What did you do after you left the steakhouse?

23   A.  I was going back and forth just trying to flag somebody for

24   help, you know, especially for my son.  And I was just like --

25   it was kind of hysteric.

HAC9RAH1                        Merritt - direct

1   Q.  Was your son able to get out of the car?

2   A.  No.

3   Q.  Was he eventually removed from the car?

4   A.  Yes.

5   Q.  How?

6   A.  I picked him up and at some point I think the emergency

7   responder took him from me.

8           MS. CROWLEY:  Your Honor, the government offers

9   Government Exhibit 202-29A.

10          THE COURT:  I'll allow it.

11          (Government's Exhibit 202-29A received in evidence)

12          MS. CROWLEY:  And if we could publish for the witness

13  and the Court 202-29B.

14  Q.  Do you recognize this photograph?

15  A.  Yes.

16  Q.  What do we see here?

17  A.  That's my son.

18          MS. CROWLEY:  Your Honor, the government offers

19  Government Exhibit 202-29B.

20          THE COURT:  I'll allow it.

21          (Government's Exhibit 202-29B received in evidence)

22  Q.  Is this a photograph of a fireman carrying your son?

23  A.  Yes.

24  Q.  Where did he carry him to?

25  A.  There was like a triage truck that was parked not too far

HAC9RAH1                    Merritt - direct

1   from the ambulances like behind the FDNY ambulance.  It was

2   much bigger.

3   Q.  And did you go inside that ambulance as well?

4   A.  Yes.

5   Q.  Were you treated for any injury in that ambulance?

6   A.  Yes.

7   Q.  What injuries?

8   A.  Mostly head.

9   Q.  Could you describe what you mean?

10  A.  At that time my ears were ringing.  A lot of vibration

11  going on in my head.  And basically I just felt like I had an

12  alien head, like I couldn't really tell what was going on, but

13  I felt like my head was just much heavier, and I couldn't

14  really grasp how I was feeling as far as my head was concerned.

15  Q.  Was your son also treated for injuries in the ambulance?

16  A.  Yes.

17  Q.  Were you eventually taken to the hospital?

18  A.  Yes.

19  Q.  Along with your son?

20  A.  Yes.

21  Q.  And were you both treated for injuries at the hospital?

22  A.  Yes.

23  Q.  When were you released from the hospital?

24  A.  It was the next day, in the morning.

25  Q.  And did you and your son receive any follow-up medical

HAC9RAH1                      Merritt – direct

1    treatment after that?

2    A.   Yes.

3    Q.   For what?

4    A.   We went for counseling and also went just for the follow-up

5    for our ears and also like the -- whatever was going on with

6    our head.

7             MS. CROWLEY:  Thank you, your Honor.  Nothing further.

8             THE COURT:  Counsel.

9             MS. SHROFF:  No, your Honor.  We have no cross.

10            THE COURT:  Thanks, Ms. Merritt.  We'll excuse the

11   witness.  Thanks very much.

12            (Witness excused)

13            MS. CROWLEY:  Your Honor, the government rests.

14            THE COURT:  Ms. Shroff, do you need a minute or do you

15   want to respond?

16            MS. SHROFF:  Yes, please.  Need a minute.

17            THE COURT:  So we'll take a five-minute break.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Do you want time to yourself?

3          MS. SHROFF:  We do, your Honor.

4          THE COURT:  Let me know when you're ready.

5          MS. SHROFF:  Sure.

6          (Recess)

7          MS. SHROFF:  Your Honor, may we just approach for a

8    minute.

9          THE COURT:  Yes.

10         (At the sidebar)

11         MS. SHROFF:  We're having the obvious question.

12         THE COURT:  Whether he testifies or not?

13         MS. SHROFF:  Right.

14         THE COURT:  He wants to?

15         MS. SHROFF:  Let's just say everybody is not on the

16   same page.  So if I could -- I know it's not --

17         THE COURT:  You've probably had this discussion

18   before?

19         MS. SHROFF:  Yes, but as you know how trials unroll.

20         THE COURT:  Okay.

21         MS. SHROFF:  I'm sorry about that.

22         THE COURT:  No, no.

23         MS. SHROFF:  So I just need --

24         THE COURT:  It's a big issue.

25         MS. SHROFF:  I don't know if you want to formally give

HAC9RAH1                    Merritt - direct

1     him --

2            THE COURT:  If he decides to testify, then I would

3     talk to him without the jury just to make sure he understands

4     that he doesn't have to, he's presumed innocent.  If he does

5     talk, you know, whatever he says can be used against him, be

6     subject to cross-examination, the usual stuff.  I just want to

7     make sure that he knowingly --

8            MS. SHROFF:  I just wanted to make sure if that's your

9     practice.

10           THE COURT:  I would do that if there's a dispute.  If

11    there is no dispute between him and counsel, so if you just say

12    we call Mr. Rahimi, then I wouldn't do it.  But if it's against

13    your advice, then I would do that for a couple of minutes.

14           MR. BOVE:  Your Honor, just so I understand.  It's

15    your practice that in the event the defendant elects not to

16    testify, you would allocute him personally as to --

17           MS. SHROFF:  No.  That's not what he said.  He said if

18    there's a dispute between --

19           THE COURT:  Counsel.

20           MS. SHROFF:  -- the defense lawyer.

21           THE COURT:  Counsel and the defendant.

22           MR. BOVE:  I think that in light of the record that

23    was just created here that there -- I think the phrase was not

24    on the same page.

25           THE COURT:  No.  No.  No.

HAC9RAH1                         Merritt - direct

1              MS. SHROFF:  It's a process.

2              THE COURT:  It's fluid right now.

3              MS. SHROFF:  Just wanted to let you know.

4              THE COURT:  We've got the jury instructions.  We're

5    handing them out.  They are very similar to the instructions

6    that you submitted.  I don't think it will take us long to go

7    through them.  The verdict sheet looks to be in good shape too.

8    We made a couple of changes to that.

9              MS. SHROFF:  Your Honor, was it the Court's thought

10   that if Mr. Rahimi doesn't testify that the government -- that

11   you're going to start summation, because then it would be

12   broken up, right, the summations will not finish today.

13             THE COURT:  Here's what I would like to do.  Whether

14   he does or doesn't, we would have the charge conference right

15   away.  I'm trying to figure out where that's going to lead us

16   timewise.  It would be advantageous to -- you can imagine a

17   scenario where you could have both summations today assuming.

18             MS. SHROFF:  But then they would have a rebuttal

19   tomorrow.

20             THE COURT:  I just don't know what the calendar is

21   going to be.  But I don't want to just have the jury here if I

22   can avoid it for ten minutes, or whatever they were here for

23   this morning, and then send them home for the day.  That seems

24   inefficient.

25             MS. SHROFF:  So let me go back.

HAC9RAH1                          Merritt – direct

1          THE COURT:  Yes.

2          MS. SHROFF:   Thanks.

3          (Continued on next page)

hac6rah2

1              (In open court; jury not present)

2              THE COURT:  Please be seated.

3              MS. SHROFF:  Your Honor, he just needs a couple

4    minutes.

5              THE COURT:  Okay.

6              MS. SHROFF:  Your Honor, in the mean time if we could

7    be -- if we can -- sorry.

8              THE COURT:  Ms. Shroff, have you made a decision as to

9    whether you are going to put on a case or not?

10             MS. SHROFF:  Mr. Rahimi needs to have five minutes on

11   his own because he has had four lawyers talking to him.  So I

12   just want him to have that.  Thank you.

13             (Pause)

14             MS. SHROFF:  We're ready to go, your Honor.

15             THE COURT:  Ms. Shroff.

16             MR. LARSEN:  Your Honor, at this time we have a motion

17   under Rule 29 for a judgment of acquittal.  The government has

18   failed to produce sufficient evidence of each element of each

19   count and therefore we move for a judgment of acquittal.

20             MR. BOVE:  Judge, the defendant's written confession

21   alone touches upon just about each and every element.  We also

22   have offered evidence from victims who sustained personal

23   injury.  There is evidence of property damage.

24             The expert testimony certainly establishes that both

25   the 23rd Street and the 27th Street devices meet the

hac6rah2

1    definitions of explosives, weapons of mass destruction, and

2    destructive devices and it goes to the definitions we're

3    talking about here.  Put simply, and I am happy to elaborate

4    if the Court would like, but we have met all the elements.

5        THE COURT:  I also have not only reviewed the

6    indictment but I went through my notes of the evidence and more

7    recently I have been working on the jury instructions, which

8    bring you to almost every element of the case, at least what

9    the legal requirements are.  So that application of Rule 29 is

10   denied.  There is ample evidence for the case to proceed to the

11   jury.

12       Ms. Shroff, the next question is whether the defense

13   is going to put on an affirmative case or not.

14       MS. SHROFF:  We're not, your Honor.

15       THE COURT:  That is the decision of Mr. Rahimi as

16   well?

17       MS. SHROFF:  That is the decision of Mr. Rahimi as

18   well.

19       THE COURT:  So I will call out the jury and I will ask

20   you the same question and if you say that you are resting, then

21   we'll take the next step.

22       MR. BOVE:  Your Honor, we do ask that Mr. Rahimi be

23   asked personally that he confirms that he understands he has a

24   right to testify and that he is electing not to exercise that

25   right.

hac6rah2

1           THE COURT:  I take Ms. Shroff's word for that.  I

2      don't think this is necessary if she says so, as she has, on

3      behalf of Mr. Rahimi.  They have just spoken for over an hour,

4      I think, on this very subject.  I assume that counsel is

5      speaking for the defendant.

6           Is that right, Ms. Shroff?

7           MS. SHROFF:  I appreciate the Court's understanding

8      that we would be thorough and that is correct, your Honor, but

9      thank you.

10          THE COURT:  We'll call the jury in.

11          (In open court; jury present)

12          THE COURT:  Please be seated.

13          We've been working during this last hour or so and now

14     I am going to call on Ms. Shroff to ask her whether she has an

15     affirmative case to put on or not.

16          Ms. Shroff.

17          MS. SHROFF:  Thank you, your Honor.  The defense rests

18     at this time.

19          THE COURT:  So where that leaves us is we need a

20     little time between now and I will give you a suggested time to

21     go over the jury instructions between myself and counsel.  Then

22     we'll move to closing.  It is about 11:00.  I am going to give

23     you until 1:00 to come back and have your lunch or whatever you

24     want to do in that time and we'll pick up at 1:00.

25          Thanks a lot.

hac6rah2

| | |
|---|---|
| 1 | (Jury excused) |
| 2 | (In open court; jury not present) |
| 3 | THE COURT:  Please be seated. |

We have handed out jury instructions to counsel.  I think they are quite similar to the joint instruction that I asked and you gave to us.  There is also a joint verdict sheet. Why don't you take some time to look it over and then we'll have our charge conference, let's say, noon for the charge conference.

Does that work?

MR. BOVE:  Yes.  Thank you, Judge.

MS. SHROFF:  That's fine, your Honor.

THE COURT:  How I do the charge conference is as follows:  I do it off the record so to speak initially.  That is to say, we walk through all the instructions and the verdict sheet and at the end of that process if either side has an objection still to a particular instruction or phrasing or the verdict sheet, we call in the court reporter and allow everybody to lodge their objections on the record.

I will see you back here at 12:00.

MS. SHROFF:  Your Honor, may we ask about the schedule on summation?  I don't know the length of the government's summation.  We would ask that either all three summations take place today.  Or if the Court is inclined to break them up, that the government not have the rebuttal tomorrow.

hac6rah2

1           THE COURT:  Let's see.

2           Do you have a sense of how long your summation might

3   be?

4           MR. BOVE:  I am going to try to shorten this up a bit,

5   Judge, but I expect it to be three hours.

6           THE COURT:  Three hours for the summation?

7           MR. BOVE:  Yes, Judge.

8           MS. SHROFF:  So then, your Honor, with all respect, I

9   ask that the defense be allowed to sum up tomorrow.

10          THE COURT:  Yes.  We'll have to if the government is

11  going to take three hours.  There will not be time.

12          Do you have a three-hour summation as well?

13          MS. SHROFF:  Three hours and one minute.

14          Kidding.

15          THE COURT:  So the answer is yes.  Even if we start

16  precisely at 1:00, we'll be at 4:00.  So we would break.

17          MS. SHROFF:  After the length of their summation, we

18  wouldn't want the rebuttal to be all alone on the following

19  day.

20          THE COURT:  I get it.

21          MS. SHROFF:  Thank you.

22          THE COURT:  In that case, we will do the defense

23  summation first thing tomorrow morning and then rebuttal.

24          MS. SHROFF:  And the charge.

25          THE COURT:  And the charge.

hac6rah2

1             MS. SHROFF:  That's fine.

2             THE COURT:  Three-hour summation?

3             MS. SHROFF:  I think Mr. Gamal summed up for three

4    hours.

5             THE COURT:  That wasn't me.

6             See if you can't trim it a little bit.

7             MR. BOVE:  Very well, Judge.

8             THE COURT:  I think less is always more in these

9    circumstances.

10             MR. LARSEN:  Your Honor, with permission, and I think

11    we did this last week, but can we bring Mr. Rahimi back at 1:10

12    to accommodate his prayer.  It is something he can do in a

13    couple minutes.  I believe we did this last week.

14             THE COURT:  Sure.  1:10 instead of 1:00.

15             MR. LARSEN:  Yes.

16             THE COURT:  Thank you.

17             There is one thing I wanted to add while you are here.

18    I wanted to mention because it came to me from I don't remember

19    who but I think there was some concern about--

20             MS. SHROFF:  Your Honor, Mr. Rahimi is no longer --

21             THE COURT:  Yes, he is.

22             MS. SHROFF:  I couldn't see him.

23             THE COURT:  That there was some concern about family

24    members not being in the audience on one day of this week.  I

25    cannot remember.  I just want everybody to know that the court

hac6rah2

1    is wide open.  Anybody can come in.  Any age can come in.  They

2    are welcome to do that.  The only requirement is that everybody

3    follow the rules and decorum of the courtroom.  Sometimes that

4    is difficult for small children.  I know that, but nevertheless

5    we ask the guardian, whoever the guardian is with the child, to

6    observe the decorum.  And if the child needs to go out or needs

7    to go to the bathroom or needs a drink, etc., instead of the

8    Court saying that, because it can be a bit distraction to

9    others in the courtroom, we ask the guardian to exercise good

10   judgment in that regard.  You know, for example, that there is

11   also an overflow courtroom for this case.  Sometimes that is a

12   good alternative for people who need to get up and get out

13   because there is no proceeding that is being disturbed.

14          So it is clear when we had a conversation the other

15   day in the courtroom, it is on the record, it is in the

16   transcript of October 10, and what I said to counsel at the

17   side bar was:  So I am going to ask defense counsel, probably

18   you Ms. Shroff, to talk to Ms. Peggy Cross-Goldenberg -- who is

19   a member of the defense team by the way -- and who I think is

20   accompanying some family members in the audience with very

21   small children here, and I don't know if they are related to

22   your client or not, but could you just ask her to pass along

23   what the normal decorum practices are in court.

24          That is the heart of what I suggested.

25          Anyway I will see you at 1:10.

hac6rah2

1          By the way, I will see counsel at noon.

2          MR. BOVE:  Thank you, Judge.

3          (Recess)

HAC9RAH3

1          (Jury not present)

2          THE COURT:  I'm just going to go over the charges and

3     if anybody feels they want to lodge an objection they can to

4     the changes that are being made or not being made.

5          So in some instances I'm going to probably say one

6     side asked for it and -- anyway, you'll see.

7          The point here is that we had the conversation which I

8     typically do without the reporter and this gives each side the

9     opportunity to state an objection they might have.

10         So the first -- so there's a comment on page nine

11    which I'm going to skip for now and come back to in a minute.

12         So there's a suggestion on page ten, line four.  I

13    think it was the defense that suggested we change "should" to

14    "may."  I'm not making that change.  I take it that's an

15    objection from the defense.

16         MR. LARSEN:  Yes, your Honor.  Even if the jury

17    doesn't have to be instructed of its power to nullify it always

18    has that power.  So we think the word should be "may."

19         THE COURT:  I got it.

20         Both parties asked that we insert a request no. 34

21    from the joint proposed instructions.  I think we don't need it

22    all.  So what I propose to do on page 14 is to insert the

23    following sentence at the end of the first full paragraph where

24    we talked about you infer.  And I'm proposing to add from the

25    joint instruction just the sentence that says "an inference is

HAC9RAH3

1    a logical, factual conclusion which you might reasonably draw

2    from the other facts that have been proved."  I think the other

3    concepts are already in the charges.  But, in any event, do you

4    both object to that or is that okay with both of you if I make

5    that change?

6                MR. DeFILIPPIS:  Fine with the government, your Honor.

7                MR. LARSEN:  Your Honor, we would just add the

8    sentence that immediately precedes the sentence which your

9    Honor just read "the matter of drawing inferences from facts in

10   evidence is not a matter of guesswork or speculation."

11               THE COURT:  So we talk about guesswork and speculation

12   in the circumstantial evidence section I think.  That's why I

13   didn't put it in here.

14               So you can lodge an objection if you like to that.

15               MR. LARSEN:  We do.

16               THE COURT:  Okay.

17               The proposed by the defense insertion on page 16 after

18   the first full paragraph to define "use" to mean to detonate.

19   I'm not making that change.  So that probably is over the

20   defense objection.  Is that right?

21               MR. LARSEN:  Yes, your Honor.  The charges here allege

22   the use of a bomb against persons and property.  And we think

23   the clear reading of the word use in the statute and certainly

24   in the indictment means to detonate.  That's especially

25   necessary since the instruction does define the other terms in

HAC9RAH3

1    the statute and use is a term, as it's been alleged in this

2    case, Mr. Rahimi is charged with either detonating or

3    attempting to detonate a bomb.

4             THE COURT:  Do you want to be heard?

5             MR. DeFILIPPIS:  Your Honor, as we pointed out in the

6    conference, to detonate is a far narrower set of activities

7    than the statute encompasses, not only because the words of the

8    statute are broader but also because, as used in this trial,

9    the word detonate was a very specific industry term that refers

10   to only one type of explosion.  And as we explained to your

11   Honor, it's simply inaccurate.

12            THE COURT:  So you want to leave it the way it is?

13            MR. DeFILIPPIS:  Correct, your Honor.

14            THE COURT:  So I'm doing that.  It will be over the

15   defense objection.

16            Then defense raised an objection on page 18.  The

17   second full paragraph which says "If you find, then the element

18   is satisfied."  That comes up about ten times or more, that

19   kind of language.  So what I propose to do is add a sentence

20   that says, "Conversely, if you don't find, then the element is

21   not satisfied."  So that balances out, I think.  Is that okay

22   with you?

23            MR. LARSEN:  Yes, Judge.

24            THE COURT:  Is that okay with you?

25            MR. DeFILIPPIS:  Your Honor, that's fine.

HAC9RAH3

1          THE COURT:  So that comes up again twice on page 19.

2     Comes up again on page 21.

3          On page 22 the defense asks that I insert at the end

4     of the third full paragraph the phrase "in the vicinity of West

5     23rd Street".  I believe that's a correct statement and I

6     propose to do that.  Is that over your objection?

7          MR. DeFILIPPIS:  Yes, your Honor.  The government

8     believes that in reciting the elements of the statute inserting

9     the government's factual theory is not appropriate.

10          THE COURT:  And I'm doing that also at the defense

11     request on page 23 at the end of the second full paragraph,

12     same terminology, "in the vicinity of West 23rd Street."  Is

13     that all right with you?

14          MR. LARSEN:  Yes, Judge.

15          THE COURT:  Same opposition?

16          MR. DeFILIPPIS:  Yes, Judge.

17          THE COURT:  Then on page 24 and page 25 and page 26

18     I'm adding that same "conversely" language.  Also on 27.  And

19     29.  And 30.

20          So the defense had a suggestion for page 36 which I am

21     adopting and that is three lines up from the bottom, after the

22     phrase "then you are" it now reads "not to decide Count Seven."

23     I'm adopting the defense suggestion that I insert "required to

24     return a verdict of not guilty on Count Seven."  I don't know

25     if the government is objecting to that or not.

HAC9RAH3

1          MR. DeFILIPPIS:  No, your Honor.

2          THE COURT:  Okay.  That comes up again on the top of

3    page 38, the very first line, instead of the phrase "not to

4    decide Count Eight," "required to return a verdict of not

5    guilty on Count Eight."  Is that okay with the defense?  That's

6    what you had in mind, right?

7          MR. LARSEN:  Yes, Judge.

8          THE COURT:  And the government is not opposed.

9          So defense has suggested on page 41 at the end of the

10   first paragraph, not a full paragraph but a carryover

11   paragraph, where this was -- I think this was a defense

12   suggestion, that I add "except as I previously instructed you

13   with regard to Counts Seven and Eight."  I forget whose

14   suggestion that was.  I think it's a good one though.  Is that

15   okay?

16         MR. LARSEN:  Yes, Judge.

17         MR. DeFILIPPIS:  Your Honor the government would

18   prefer to leave it as is.

19         THE COURT:  So this is, though, the concept as you

20   know -- well, okay.  That's fine.

21         So the government proposed adding what's called a

22   persons-not-on-trial paragraph.  I don't think it fits here.

23   So I'm proposing not to do that.  Is that over the government

24   objection?

25         MR. DeFILIPPIS:  Yes, your Honor.  We think there were

HAC9RAH3

1  several persons mentioned during the course of the trial that

2  warrant that instruction.

3          THE COURT:  And what does the defense think?

4          MR. LARSEN:  We agree with the Court.

5          THE COURT:  Similar acts.  There was a proposal to

6  change this instruction.  This is the instruction that I gave

7  earlier I believe in this case, in fact, so I'm sticking with

8  the same language and not making a change to similar acts.  Is

9  that okay with you?

10         MR. LARSEN:  Yes.

11         THE COURT:  And you have -- you still want to add to

12 that?

13         MR. DeFILIPPIS:  Your Honor, I don't believe we asked

14 for any change on the similar acts.

15         THE COURT:  Good.  I thought somebody had.

16         The particular investigative techniques language I'm

17 going to leave as it is.  I think it may have been the

18 government that proposed some addition to that.  But I think it

19 works as it is.  Is that okay with the defense?

20         MR. LARSEN:  Yes.

21         THE COURT:  How about the government?

22         MR. DeFILIPPIS:  Yes, your Honor.  As we pointed out,

23 we would prefer the full instruction that we proposed which

24 references the fact that the government is not on trial and

25 that law enforcement techniques are not at issue because the

HAC9RAH3

1    defense opened on that and it has been raised during the course

2    of the trial.

3         THE COURT:  At the bottom of page 44, the stipulation

4    of facts, deleting reference to testimony.  There were no

5    stipulations of testimony.  That carries over to page 45.

6         I'm deleting also the instruction, defendant's

7    testimony.  There was no testimony and there need not be.

8         Over the objection, I believe this is of the defense,

9    on page 46 I'm leaving in the instruction, "Punishment is not

10   to be considered by the jury."  I said that earlier in the

11   preliminary instructions.  Would that be over your objection?

12        MR. LARSEN:  Yes, Judge.

13        THE COURT:  And how about the government?

14        MR. DeFILIPPIS:  The government believes that

15   instruction is appropriate, your Honor.

16        THE COURT:  I'm leaving in the evidence obtained

17   pursuant to search objection.  I think that was objected to by

18   the defense; is that right?

19        MR. LARSEN:  Yes.

20        THE COURT:  How about the government?

21        MR. DeFILIPPIS:  Your Honor we were fine with that

22   instruction.  We think it's appropriate.

23        THE COURT:  I'm also leaving in the sympathy oath as

24   jurors instruction.  Did you want to change that?

25        MR. DeFILIPPIS:  The government does not, your Honor.

HAC9RAH3

1          THE COURT:  Did you want to change that?  You wanted

2     that deleted, I think?

3          MR. LARSEN:  Correct.

4          THE COURT:  So here on page 50 is the same issue on

5     line two, verdict should be guilty as opposed to verdict may be

6     guilty.  I'm going to leave it as it is.  And that is over the

7     defense objection, I think, correct?

8          MR. LARSEN:  Yes, Judge.

9          THE COURT:  How about the government?

10         MR. DeFILIPPIS:  The government prefers to leave it as

11    it is, as your Honor suggested.

12         THE COURT:  So those are the instructions.

13         There's unanimity on the verdict sheet.  So we won't

14    change that.

15         Returning to page nine.  For the moment you can assume

16    that that instruction is not changing but I'm still looking at

17    that.  So I know the defense wants a change, delete the word

18    "or suspicion," is that right, and the government wants to

19    leave it as it is.

20         MR. DeFILIPPIS:  Correct, your Honor.

21         THE COURT:  So assume, unless you hear from me, that

22    it will remain the way it is.  If there's a change I will let

23    you know.

24         MR. LARSEN:  Thank you, Judge.  Just one final point

25    on the inference instruction.  I believe the Court said --

HAC9RAH3

1        THE COURT:  What page now?

2        MR. LARSEN:  This will be inserted as agreed upon.

3        THE COURT:  Insertion -- I've lost the page.

4        MR. LARSEN:  I'm -- I believe it was 14.

5        THE COURT:  I have the rider anyway.

6        MR. LARSEN:  Yes.  Because we had requested that the

7   preceding sentence about inferences not being a matter of

8   guesswork or speculation be added, and I believe the Court said

9   that that's stated in the circumstantial evidence charge, but I

10  don't believe that it is.  It may be elsewhere in the charge,

11  and we'll review it during the government's summation.  But we

12  do think it's critical that if we're going to instruct the jury

13  on inferences we have to make clear that inferences are not a

14  matter of guessing or speculating.

15        THE COURT:  You wanted that whole instruction in so

16  you're probably okay with that too?

17        MR. DeFILIPPIS:  We did, your Honor.  So we wouldn't

18  object.

19        THE COURT:  So we'll add that sentence just before --

20  immediately before the sentence that I was proposing to add.

21        MR. DeFILIPPIS:  We're not going to object to that,

22  your Honor.

23        MR. LARSEN:  Thank you.

24        THE COURT:  There is one other thing.  There's a page

25  here which identifies the experts.  Is there anybody that was

HAC9RAH3

1    left out?

2             MR. DeFILIPPIS:  No.

3             THE COURT:  Great.  Thanks.  We're good to go.

4             So are the people here briefly for the McLeod case;

5    and if so, if you could meet me in the robing room with the

6    court reporter.  As soon as I finish that, I'll come back out

7    and we'll start with the government's summation.

8             (Continued on next page)

9             THE COURT:  Just one addendum.  I did review the

10   reasonable doubt instruction.  I'm going to leave it the way it

11   exists.  It's compatible with the Pattern Jury Instructions.

12            So we will call in the jury and hear the government's

13   summation.

14            (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Please be seated everybody.  We'll start

 3    with the summations and the government typically goes first.

 4    So we'll call on Mr. Bove for that.

 5              MR. BOVE:  Thank you, your Honor.

 6              THE COURT:  You bet.

 7              MR. BOVE:  May I proceed, Judge?

 8              THE COURT:  Yes.

 9              MR. BOVE:  Good afternoon, ladies and gentlemen.

10              JURY:  Good afternoon.

11              MR. BOVE:  Last September a bomb went off at a charity

12    race on a Saturday morning in New Jersey.  Less than twelve

13    hours after that a second bomb went off outside a home for the

14    disabled on 23rd Street in Manhattan.  Two hours later a

15    third bomb was found less than four blocks away on 27th

16    Street planted near an outdoor hotel and a hotel right next to

17    it encased in glass.

18              The FBI rushed to these scenes and so did the first

19    responders.  And by some miracle no one was killed.  And as the

20    victims were treated, as the dust settled, as debris was

21    cleared from the streets, a series of questions emerged.  Who

22    did these things?  How?  And why?

23              Now that you have seen and heard all of the evidence

24    at this trial you know the answers to those questions.  Who did

25    these things?  This man did these things.  The defendant, Ahmad

1    Khan Rahimi, conducted these bombings.

2              How did he do it?  He bought bomb parts.  He followed

3    terrorist blueprints.  He built bombs in his home.  And he

4    carried out this attack in a cold, calculated way with evil in

5    his heart beginning at about 5 a.m. on Saturday, September 17,

6    2016.  Why did he do it --

7              THE COURT:  Mr. Bove, you can come back up to the

8    podium.

9              MS. SHROFF:  Thank you, your Honor.

10             MR. BOVE:  You know why he did it.  Because he wrote

11   it down.  He wrote it down in advance in an open letter

12   directed to the U.S. Government that he knew would be found

13   after his attack.  In that letter the defendant described his

14   terrorist motivations, his deadly intent, and his plans for the

15   bombs.  That letter is a claim of responsibility for this

16   attack.  Because the defendant was proud of his bombs.  He was

17   proud of his plan.  He wanted credit for his acts of war.

18             These are some of the things that the defendant said

19   in that letter.  *Inshallah*.  God willing.  The sounds of the

20   bombs will be heard in the streets.  Gunshots to your police.

21   Death to your oppression.

22             This letter is more than a claim of responsibility.

23   It is a written confession.  And it is one of the reasons that

24   you know that the defendant committed these crimes.

25             But, ladies and gentlemen, that's not the only

1    evidence, not by a long shot.  You know from the surveillance

2    video that the defendant conducted these bombings.  You know

3    from the evidence of his fingerprints, and his DNA that he did

4    this.  You know from his purchases at Amazon, Home Depot, and

5    eBay that he conducted this attack.  And you know from the bomb

6    instructions and the terrorist propaganda on his laptop, and

7    his iCloud account that he did the this.

8          All of the evidence shows you that the defendant

9    conducted this attack.  An attack on the United States, an

10   attack intended to kill Americans.  And an attack designed to

11   terrorize this city.

12         All of the evidence shows that the defendant planned

13   this attack for months.  He researched bombs.  He built them.

14   And he tested them.

15         And all of the evidence also shows that he carried out

16   the attack on September 17 with tactical precision.  You

17   watched a lot of that on video as he carried the bombs through

18   the streets of this city.

19         You watched him make three pauses on his way down to

20   23rd Street.  First outside Penn Station.  Second, at a bus

21   stop on Eighth Avenue for about 20 minutes.  And third, on the

22   steps of a church on 23rd Street right near where he planted

23   that bomb.

24         He made those stops, ladies and gentlemen, because he

25   was on a schedule.  He had already set the alarms on the

1    cellphones that he was using as the detonators.  But each time

2    he stopped he watched crowds of New Yorkers walk by.  He

3    watched them and he wanted to kill them.  He wanted to maximize

4    the death, the devastation, and the destruction caused by this

5    attack.

6         In order to achieve that objective the defendant chose

7    soft targets, defenseless locations, vulnerable victims.

8    People like unsuspecting runners at a charity race.  The

9    residents at Selis Manor on 23rd Street.  People like Vicky

10   Feria, Cort Cheek, Mary West and her dug Judy.  He chose that

11   outdoor restaurant and he chose the hotel.  All on the week of

12   the United Nations conference that Eric Ward told you about,

13   one of the busiest times of the year in the city for

14   international visitors and for business at hotels and inns.

15        Now, Ms. Crowley told you at the beginning of this

16   trial that people that the defendant targeted had no idea what

17   was coming.  They could not protect themselves from this man's

18   bombs.  Only a series of acts of grace saved these people's

19   lives.  Interventions by someone or something completely

20   independent of that man's terrorist etiology and his violent

21   intent.  Americans.

22        Now, you heard from some of the victims of this crime

23   and you watched some of their experiences on video.  Sprinting

24   from the blast.  Glass crashing around them.  Bleeding from

25   shrapnel.  Clinging to their children.  Trying to protect their

 1   loved ones, their families.

 2          You heard powerful stories of courage during this

 3   trial.  New Yorkers bent but they did not break in response to

 4   this attack.

 5          Now I want to pause here and I want to be candid with

 6   you right upfront.  There are going to be times today when I

 7   don't have words to summarize some of the evidence that you saw

 8   relating to this attack.  Cort Cheek made this point last week

 9   when he said that nothing compares to what happened to him that

10   night.  I know that you remember what the victims said and how

11   they said it.

12          These people are clearly still impacted now by what

13   this man did that night.  Mary West told you that directly and

14   it could not have been more obvious from Arkeida Wilson's body

15   language on that witness stand that even today she's haunted by

16   what happened that night.

17          And I have no words for the video that you saw of

18   Ms. Wilson and her friends walking into the defendant's bomb on

19   23rd Street as it went off.

20          But the defense chose some words.  They chose some

21   words to describe the evidence in this case.  That happened

22   during opening statements.  And the words they chose were

23   "tiresome" and "repetitive."  Here's the transcript is up on

24   the screen now of what was said during opening statements.

25          Now the defendant has no burden at this trial.  He's

1    presumed innocent.  We bear the burden.  We do is so proudly

2    and we must prove that the defendant committed these crimes

3    beyond a reasonable doubt.

4         But when the defense speaks you're entitled to listen,

5    scrutinize what they say, think about whether it makes sense,

6    it's consistent with what you're seeing and hearing at the

7    trial.

8         And so here they did choose to speak and these are the

9    words they chose:  "tiresome, repetitive."

10        Now, it's natural for the government and the defense

11   lawyers to disagree during the course of a criminal trial.  Of

12   course.  And I think this might have to be one of those times.

13   Because I submit to you that there was nothing tiresome about

14   the proof that you have heard over the last week-and-a-half.

15   And you have been attentive jurors.  We have watched you pay

16   careful attention throughout this trial.  We thank you and we

17   appreciate the effort so far.

18        So think about it.  Was it tiresome to hear from the

19   defendant's victims?  Was it tiresome to hear from people like

20   Eric Ward and Adam Krell who told you about how the defendant's

21   bomb ripped through 23rd Street destroying buildings and

22   businesses?

23        Was it tiresome to hear from law enforcement witnesses

24   who told you about how they rushed to these scenes, worked 24/7

25   to collect evidence of the defendant's bombs so they could be

1    presented to you at this trial?

2            Was it tiresome to review the evidence of the

3    terrorist propaganda and the bomb making instructions on this

4    man's laptop and in his iCloud account?

5            Did you find it tiresome to hear from bomb technicians

6    who diffused bombs left by the defendant at the crime scenes in

7    this case, men like Detective Hallik who went to 27th Street,

8    recovered the defendant's bomb, diffused it, made it safe,

9    protected the city, and preserved that evidence so that you

10   could see it during this trial?  Was that tiresome?

11           Now you can be sure that the defendant wishes you

12   hadn't seen and heard all that evidence because it proves that

13   he did these things.  But tiresome?  I think not.

14           Now there's a little bit of room for common ground, a

15   potential agreement between the defense and I on the issue of

16   whether the evidence was repetitive because when you go to a

17   trial and in the first two hours you're presented with the

18   defendant's ringing confession, it's pretty clear, as it was

19   here, that this is not a close case.  But there was more

20   evidence.  A lot more.

21           Let's talk about the video.  Ladies and gentlemen,

22   there's not just one video in evidence of the defendant

23   committing this crime.  There are 45 videos from September 17

24   of 2016 of the defendant carrying these bombs around.  That's

25   just one day.

1           There are twelve more videos the next day as he walked

2    around Penn Station and back to New Jersey with a backpack full

3    of six more bombs.

4           So maybe the evidence is repetitive in the sense that

5    the defendant was repeatedly caught on video committing this

6    crime.

7           Let's talk about the fingerprints.  There's not just

8    one fingerprint identified to the defendant in this case on the

9    evidence.  There are more than 40.  There are over 20

10   fingerprints from that man on the bombs.  So maybe the evidence

11   is repetitive in the sense that the defendant repeatedly

12   touched these bombs as he designed and built them and that

13   proof has been presented to you now.

14          How about the DNA?  Well after you've heard that the

15   defendant has a written confession, is caught on video, after

16   you've heard about the fingerprints, maybe it's a little

17   repetitive to learn -- certainly not surprising -- that his DNA

18   is on the cellphones that he used as bomb detonators, a bomb

19   detonator at Seaside and a bomb detonator for the bomb he left

20   at 27th Street.

21          But think about what that forensic evidence means,

22   ladies and gentlemen.  That shows you that the defendant -- he

23   didn't just carry these bombs around in bags like you saw on

24   the video.  That's not all he did.  The fingerprints and the

25   DNA prove to you that he made the bombs because his

1    fingerprints and DNA are on the components.  The fingerprints

2    are inside the cellphones.  That shows you that the defendant

3    designed these things, he built them, and because he did those

4    two things you know that he understood their destructive

5    potential.  He knew that he had built deadly devices.  He

6    intended to kill people with those devices.

7            So, ladies and gentlemen, tiresome and repetitive are

8    not the words that I would have chosen.  That's not a fair

9    accurate -- that's not a fair summary of what the evidence has

10   shown or the way it's come in at this trial.  And the words

11   that I'm going to ask you to focus on during my closing

12   statement today are the ones I started with.  Who?  How?  And

13   why?

14           I'm going to ask you to think about those questions as

15   I talk about the evidence.  Because this is my opportunity to

16   show you how it all fits together.  The evidence came in during

17   the trial in bits and pieces.  Not always chronologically.  And

18   this is my chance to walk you through it step by step.  And I

19   ask that as I do that you keep these questions in mind.  Who?

20   How?  And why?

21           And if you do that, and you continue to pay careful

22   attention to the evidence, then I submit to you that at the end

23   of your deliberations after you've listened to all the

24   summations, listened to Judge Berman's instructions, I submit

25   to you that only one word will suffice, only one word will be

1    appropriate.  Guilty.  The defendant is guilty.  He is guilty

2    beyond a reasonable doubt and he is guilty of each and every

3    charge in the indictment.

4           So this is a little roadmap for what I plan to cover

5    during the rest of my closing statement.  We're going to talk

6    about the evidence.  We're going to start with the defendant's

7    letter, talk about what that means.

8           Next I'm going to talk a little bit about the evidence

9    of his radicalization.  When I say that what I mean is the

10   evidence that the defendant started to think about jihad, holy

11   war against the United States.  He started to pursue martyrdom.

12   He wanted to die in a terrorist attack.  You've seen that

13   evidence that it dates back to 2012.

14          Then we're going to discuss how he planned the attack.

15   That process started in at least May of 2016 with that Home

16   Depot surveillance video that you saw.  And so we're going to

17   walk through that proof.

18          Next we'll talk about the attack itself.  We'll start

19   at 5 a.m. on September 17 and move forward as the defendant

20   planted the bombs in Seaside, 23rd Street, 27th Street, and

21   then back at the Elizabeth Train Station.

22          Next we'll talk about the evidence that was picked up

23   after his arrest, a little bit more about the letter, but

24   perhaps more importantly at that point in the closing the

25   things that were found at his house at 104 Elmora Avenue.

1          After that we're going to talk in more detail about

2     the bombs themselves.  I'm going summarize for you some of the

3     evidence that you heard over the last two days from the people

4     from the Quantico lab, the experts.

5          After we've talked about the evidence I'm going to

6     finish by talking about each of the eight charges.

7          Before we get there I will give you a little preview.

8          The charges in the indictment are basically arranged

9     in three categories.  There are three charges that relate to

10    the 23rd Street bomb.  Count One charges the defendant with

11    using a weapon of mass destruction.  Count Three charges him

12    with bombing a place of public use.  And Count Four charges him

13    with destruction of property by explosive.

14         Judge Berman is going to give you the instructions on

15    the law.  That controls no matter what I say today.  And he's

16    also going to give you a verdict sheet that will help guide

17    your deliberations.  But as I talk about the evidence please

18    keep in mind that this is the first category of charges.

19         The second category of charges relates to the 27th

20    Street bomb.  So Count Two charges the defendant with use and

21    attempted use of a weapon of mass destruction.  And Count Five

22    charges the defendant with attempted destruction of property by

23    explosive.

24         Now, it's clear, ladies and gentlemen, the bomb at

25    27th Street didn't go off.  But the defendant clearly

HAC9RAH3                    Summation - Mr. Bove

designed it to.  He designed it to go off.  He designed it to

kill people.  And he designed it to destroy property.  Those

were his intentions when he left that device near the mailbox

on 27th Street.  And it's no defense for him that the bomb

was exposed, found by Jane Schreibman, 911 was called and that

the NYPD was able to diffuse that bomb.  That's because Counts

Two and Five, these 27th Street counts, charge attempts.

I expect that Judge Berman will instruct you that the

defendant is guilty of an attempt if he intended to commit the

crime and if he took a substantial step towards committing it.

And you know that he did both of those things.  He designed

that bomb to kill.  He knew it would work.  He knew it would

work because the Seaside bomb had gone off and the 23rd

Street bomb had gone off.  His bomb making plans worked.  He

knew that when he put the 27th Street bomb there.

And he did not take just one substantial step.  He

took many.  He took many steps all the way to 27th Street and

he took many steps in building that bomb.  He left it there

that night fully capable of exploding and intending that it

would explode.  And that's what matters, I submit to you, for

the 27th Street charges.

Now the last set of charges relate to the

transportation, use, and possession of these bombs.  Separate

and apart from the bombing that happened that the defendant

conducted at 23rd Street and the one that he attempted to

conduct at 27th Street, he created grave dangers by carrying

these bombs around, including in Manhattan, grave dangers for

all of the people who were on the street that night as he made

his way down Eighth Avenue and all of the people that were

still on the street as he went from 23rd to 27th Street.

He walked those bombs through busy Penn Station.  You

know that those bombs could have gone off at any moment because

you heard about their contents.  You heard this morning from

Special Agent DeFusco about the HMTD, that highly volatile

primary explosive that was packed in the 27th Street device.

Bombs could have gone off at any time just because of the

explosives the defendant made.  And because of that, he's

charged with these additional crimes relating to having carried

them around.

There is no miracle defense here, ladies and

gentlemen.  It's not a defense that no one died.  It's not a

defense that the bombs didn't go off while the defendant

transported them to 23rd Street and 27th Street.  And it's

not a defense that the 27th Street bomb was diffused before

it could explode.

The law prohibits attempted bombings and

transportation of bombs and certain types of explosives because

the risks that these activities create are simply unacceptable.

They can't be tolerated.  And because the defendant created

those additional risks when he transported the bombs, he is

1    guilty of these additional charges in that third category.

2              So with that preview let's talk about the evidence

3    and, as I said, we're going to start with his letter.

4              This is page one of the letter and right in the

5    introduction the defendant makes clear this is about a conflict

6    between good and evil.  You can see that in the top box.

7              The next line, ladies and gentlemen, is how you know

8    that this was an attack that was designed to target the United

9    States and Americans in the city.  The letter is directed in

10   writing to you, USA government, and it makes an accusation

11   about slaughter of Mujahideen.  And you know what that word

12   means from Mr. Fouad.  It means people engaged in jihad.

13             On page two the defendant makes a reference to Anwar

14   al-Awlaki.  Says Anwar al-Awlaki has spoken the truth.  And you

15   know who al-Awlaki is from Aaron Zelin.  He was one of the

16   senior leaders of al-Qaeda in the Arabian Peninsula.  He gave

17   lectures and promoted attacks on American civilians.  Some of

18   the parts of the transcript are here on the screen.  Zelin told

19   you that al-Awlaki was putting out messages online calling for

20   jihad against the United States.

21             And why are we talking about this right now?  Because

22   these are the names, this is one of them, of the people who the

23   defendant included in his letter.  These are the people who the

24   defendant found motivating, whose guidance he found, in his

25   word, clear.  These people and their messages explain what the

defendant intended by this attack.  Evidence of the defendant's
motive comes from them and helps to explain why he did what he
did.

       You also learned about *Inspire* magazine at this trial,
a publication by al-Qaeda in the Arabian Peninsula by the same
organization that al-Awlaki was affiliated with.  And this is
an issue that was found on the defendant's laptop.  It's the
first issue of the magazine by AQAP.  And al-Awlaki was one of
the guest speakers, guest writers.  And what does he say?
That's in the bottom image here, "We will bomb and we will
assassinate."  This is the message that the defendant found
persuasive.  This is what drove him in conducting the attacks
that he did.

       A little bit further down on page two the defendant
gave an example of someone who conducted the type of attack
that he would later emulate.  He gives the example of Nidal
Hasan.  It says al-Awlaki has spoken the truth.  Stay behind
and fight like Nidal Hasan.  And you know from Mr. Zelin who
Hasan is.

       Hasan conducted an attack in Texas in 2009.  He killed
13 people and injured up to 30 more in an attack with a rifle.
This is a lone wolf attack, just like the one that the
defendant committed.  And you can tell from the letter that
these are the types of things he was thinking about as he put
his plan together.

1          Hasan was actually praised in *Inspire* magazine for the

2     lone wolf attack that he committed.  What do you have to offer

3     to the lone Mujahid?  You're asking about the past, I believe

4     that through *Inspire* we have passed the idea and tried to

5     support it.  The idea of these lone wolf attacks.  The

6     defendant was reading *Inspire* magazine.  He downloaded it to

7     think about what steps he wanted to take in support of his

8     jihad and he chose to follow the example of Nidal Hasan.

9          Page three of the letter.  Let's start at the top of

10    the page.  There's a reference to the FBI and Homeland

11    Security.  Basically what this says, ladies and gentlemen, is

12    that the defendant got concerned at some point that he was

13    under surveillance.  He was concerned that law enforcement was

14    watching him.  And then he explained what he did after that

15    concern arose.  He prayed that jihad would not be taken away

16    from him.  He begged for shahadat, for martyrdom.

17         So what does this mean?  It means that the defendant

18    was worried that he was going to be arrested before he could

19    conduct this attack.  He became concerned that law enforcement

20    was watching him so he had to take some steps to try and avoid

21    being arrested so he could carry this out.  The defendant never

22    planned to fully get away with this.  He wanted to claim

23    responsibility for it.  But he was also worried that law

24    enforcement would stop him before he did it.

25         Next page of the letter the defendant talks about

going back to sham.  You know from Mr. Zelin that that's a
reference to ISIS, ISIS controlled territory.

So the defendant here is describing some interest in
going to fight overseas; that he was thinking about going to
fight with a terrorist organization abroad.  But this incident
when he got concerned that law enforcement was watching him, it
caused him to think that maybe I can't travel.  Maybe I won't
make it that far.

And so in the next paragraph he says I looked for
guidance and guidance came.  Again, from al-Awlaki.  And then
he includes a second name brother Adnani, who is Abu Mohammed
al-Adnani, a member of ISIS.

What guidance did he get from them?  What was his
understanding of what those leaders wanted him to do?  Attack
the kuffar in their backyard; kuffar, a reference to
nonbelievers, meaning not Muslims.  And he felt motivated by
the messages of these terrorists to conduct an attack here in
the United States.

Here a little bit of the evidence that was presented
to you about ISIS.  ISIS's primary goal is to establish
caliphate, an the Islamic State throughout the entire world.
There are also people who are motivated and directed by ISIS to
conduct attacks and inspires their attacks in the United
States.

Here's a little bit about Adnani, somebody who was

encouraging, on behalf of ISIS, people to conduct lone wolf attacks like the one that the defendant conducted.

So now the defendant is describing how he reacted to this incident, the concern that he had that he could be arrested before he got to actually conduct an attack. What did he do? Everything had to be done quietly and I had to lie to cover up my tracks.

So we'll talk about some of the evidence of how he did that. But this is a letter that described exactly his thought process as he planned this attack.

Now I said the letter was a claim of responsibility and that's actually an important word in the propaganda of AQAP. This is another article from *Inspire* magazine that talks about this important question of claims of responsibility. In the middle here you can see it says: If it is a martyrdom operation then it is 90 percent claimed. What do they mean by that? That it would be obvious if the person conducting an attack died, who he was and why he did it. But then the next suggestion is: Placing a piece of paper near the location of the operation. And that, ladies and gentlemen, is just what the defendant did. That's what this letter is. It's a claim of responsibility.

Here's page six of the letter. The defendant is still talking about being blocked from traveling to fight overseas on behalf of a terrorist organization. He's expressing

1    frustration that he wasn't allowed to meet death overseas.

2            And so this is what he decided to do.  "Your people

3    will hear pipe bombs, pressure cooker bombs going off in the

4    streets they plan to run a mile."  You saw those pipe bombs in

5    Seaside Park.  You saw the pressure cooker bombs at 23rd

6    Street and 27th Street.  That reference to the streets they

7    plan to run a mile is a reference to this race in Seaside Park

8    that Mr. Costello told you about.

9            And then at the bottom of the screen you can see a

10   reference to you Osama bin Laden.  "Brother Osama bin Laden

11   offered you truce."

12           This is what you learned.  This is the evidence about

13   bin Laden.  That he issued two fatwas in 1996 and 1998

14   declaring war against the United States, calling for attacks

15   against American civilians.  This is the type of message that

16   motivated the defendant to do what he did.

17           And this reference to a truce, it's directly out of

18   *Inspire* magazine.  This is the article where that truce is

19   described that bin Laden offered.

20           And what does this show you?  It shows you that the

21   defendant didn't just download these magazines.  He was an

22   active consumer of this propaganda.  He read it carefully.  He

23   thought about what it meant and he internalized it.  He

24   internalized it and he acted on it.

25           And this is the final letter, the final page of the

1    letter.  "The sounds of the bombs will be heard in the streets.

2    Gunshots to your police.  Death to your oppression."

3              So that's the written confession, ladies and

4    gentlemen.  That is a written-out plan of exactly what the

5    defendant intended to do and that's exactly what he did.

6              So let's talk now about how his state of mind changed

7    when he decided to carry out this attack.  And the evidence

8    shows that he made that decision long before he wrote the

9    letter.

10             This is an e-mail from July of 2012.  And you can see

11   in the from line that the subscriber name on this account is

12   Ahmad Rahimi.  The e-mail is ahmadkakar@live.com.  The subject

13   of the e-mail is al-Awlaki.  He's thinking about al-Awlaki back

14   in 2012 as someone who is motivating him to do what he did.

15             And look at the attachment to this e-mail.  It's that

16   book of jihad that you saw.  These are some of the things that

17   were inside of it.

18             Chapter one on the command of jihad against the

19   nonbelievers and its mandate, and warnings against those who

20   don't practice jihad.  Chapter two describing the virtues of

21   jihad and mujahideen.  And chapter 16 these necessary rulings.

22             This is right out of the book, ladies and gentlemen.

23   It is allowed to ambush an enemy at night even if there are

24   women and children among them since that is a necessity of

25   jihad.  That's exactly what this man did.

HAC9RAH3                     Summation – Mr. Bove

1              After 2012 there's additional evidence that the

2       defendant continued to look up terrorist propaganda and consume

3       things, read things that would later motivate him to conduct

4       this attack.

5              These are internet searches from the timefreeze e-mail

6       account.  If you start at the bottom, you can see he's looking

7       at nasheeds, religious songs relating to jihad.  And he

8       continues to conduct searches relating to jihad.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BOVE:  The top two are important.  February 2015

2     he is looking *Inspire* magazine.  He is actually on the website

3     of Aaron Zelin, the government's expert witness.  He is

4     downloading *Inspire* so that he can read it and use it in

5     connection with this attack.  The search above that,

6     January 2015, the defendant of is looking up *Dabig*, which is a

7     similar propaganda publication but this one for ISIS.

8          The defendant didn't just do these searches, ladies

9     and gentlemen.  He downloaded this material first onto his

10    phone and then onto his lap top.  These are images from the lap

11    top.  Nasheed is about Jihad.  These are issues of *Inspire*

12    magazine also from the lap top.  Remember what Mr. Donaldson

13    told you.  These files were saved in a folder that was a backup

14    from the defendant's cell phone and then onto the lap top.

15         So I have talked a little bit about Internet searches

16    from this Timefreeze G-Mail account.  These are the two

17    subscriber documents.  You can see that the defendant was using

18    aliases when he set them up.  On the left side, the Google

19    document it says Timefreeze.  On the right side, Quagmire.  How

20    do you know this is the defendant?  From his wife's phone.

21    There is a contact saved in that phone named Ahmad, the

22    defendant's first name associated with that G-Mail account,

23    Timefreeze77@gmail.com.

24         Look at the attempted communications between the

25    wife's phone and this Ahmad contact on September 17th.  She is

Hac6rah4                    Summation - Mr. Bove

1    trying to figure out what is going on and reaching out to him.

2    You know that this Ahmad is that Ahmad and the Timefreeze is

3    the e-mail and the iCloud that he used from this phone.  There

4    are pictures of the defendant on his wife's phone as you would

5    expect and that is how you know it was his G-mail account.

6           You also know that this is his e-mail account from the

7    lap top.  There are other documents on the lap top that require

8    to Quagmire's IPhone.  That is the alias associated with

9    Timefreeze e-mail account.  These show you, too, that these are

10   linked -- the e-mail account, the iCloud account, and the lap

11   top.  The commonality there, the thing they are linked to, is

12   the defendant.  Three more documents from the lap top all

13   referring to Quagmire's iPhone.

14          Is there any question that the lap top is the

15   defendant's, ladies and gentlemen?  This was seized outside his

16   living room, Room G at 104 Elmora.  In that same room is an

17   Amazon box from one of the bomb components that he ordered, one

18   of the purchases that he made.  That lap top is absolutely

19   littered with selfies of the defendant.  It is his computer,

20   ladies and gentlemen.  It has selfies, it has identification

21   documents, his social security card.  This is the lap top he

22   used and that helps you to understand why the Timefreeze

23   account is was created.

24          So now let's go to the actual planning of the attack.

25   As I said, this starts in May of 2016 with the surveillance

Hac6rah4                    Summation - Mr. Bove

video from Home Depot.  I am not going to show you the video

now, but these are stills from it.  You can see the defendant

in the store.  He paid cash.  What did he buy?  Bomb parts --

galvanized pipe that he used at Seaside, caps for the pipe that

he used at Seaside, and the cap elbow that was found in

Elizabeth.

Remember, also that Agent Zimmermann told you about

the basement at 104 Elmora and the Home Depot bag that was

found down there, along with the saws and the other tools,

drill bits.  This is one of the workshops that the defendant

used at 104 Elmora to build these bombs.  Like I said, these

are the purchases and this is where they ended up at crime

scenes.  Remember when Erin Brandt testified and I walked up to

her and I said, What is this SKU number on this pipe, the pipe

you see in top right and she read it and it matched the Home

Depot receipt exactly?  He bought this and made it into a bomb

just like he bought the pipe elbow and made it into a bomb.

By June 5th you can see the defendant picking up

additional aliases.  Again, this isn't because he ever planned

to get away with this crime.  It was because he wanted to make

sure he didn't get arrested before he could conduct the attack.

So the top picture you see on the screen here is the e-mail we

looked at when the defendant was using his real name associated

with the Ahmadkakar e-mail account.

On June 5th, 2015, he sends a recovery e-mail.  He

1    wants to get access to that account again.  When he does that,

2    he changes the subscriber name.  He is not Ahmad Rahimi

3    anymore.  He is Aloha Hawaii.  You can see that in the bottom

4    e-mail, which he sends to himself at G-Mail account with the

5    subject "New."  So he is getting set up.  Why?  Because he

6    wanted access to the *Book of Jihad* again.  He wanted to start

7    to review its teaching, teaching about Jihad, martyrdom, and

8    the ambush principle that I described earlier.  You know that

9    this document was not just in his e-mail account.  It was on

10    the lap top as well.  That is is what you see on the right side

11    the screen here.  This document was taken from the e-mail

12    account and backed up onto his iPhone and then on to the lap

13    top.  The defendant was actively reviewing the *Book of Jihad* in

14    June and July of 2016.

15          Here is alias number four, Ronald Welsh.  The document

16    on the top of the screen is the subscriber information for the

17    e-mail account that the defendant set up in the name Ronald

18    Welsh.  How do you know he did that?  Look at the terms of

19    service IP.  That IP address matches what you see in the bottom

20    right of the screen because the defendant used a wi-fi at his

21    house at 104 Elmora Avenue to access the Internet to set up the

22    Ronald Welsh.  How else do you know he is the one who set it

23    up?  The credit card you see on the left is from the lap top.

24    There is a picture of the credit card that he set up in Ronald

25    Welsh's name on the lap top.

Hac6rah4                    Summation - Mr. Bove

1          So he sets up the e-mail account on June 16th of 2016.

2   What else does he do?  He sets up an Amazon account.  You see

3   in the bottom right there the created date of the Ronald Welsh

4   Amazon account?  It is the same day.  Why does he have a

5   picture of that credit card on his lap top?  Because he used it

6   as the purchase information for the Amazon account.  The number

7   matches.  The name matches.

8          June 20th was a busy day for buying bomb components

9   for the defendant.  These are some of the things he used using

10  the Ronald Welsh Amazon account on June 20th.  We'll talk about

11  them in a minute, but you can see he had them shipped to 587

12  Fayette Street.  You see that in the middle of the screen.

13  That is the Amazon document.  Then on the right left corners

14  you can see from the lap top the purchase confirmations.  He

15  kind of shed the alias there and they are shipped to Kennedy

16  Ahmad at Kennedy Fried Chicken or Kennedy Fried Chicken Ahmad.

17  These are in the left and right corners.

18         What is Kennedy Fried Chicken?  That is where the

19  defendant worked, ladies and gentlemen.  You heard that from

20  Younus Rahimi.  The defendant is buying bomb parts under the

21  alias Ronald Welsh and shipping them to his place of work by

22  June 20th, 2016 so he can start to put these together.  He also

23  uses his own name that day to buy some additional things.  This

24  is an eBay account where in the name of Ahmad Rahimi the

25  shipping address is also 587 Fayette.  He is shipping bomb

1    components to his place of work on June 20th.

2              Now let's talk about what he bought.  These are the

3    Amazon purchases.  We'll go through them one by one and you'll

4    see that they link up almost exactly with the HMTD instructions

5    that were on the lap top.  He was buying the tool he needed to

6    make this incredibly dangerous explosive in his house.  Let's

7    start with the top one in the red box, citric acid powder.  You

8    see in the bottom right citric acid is one of the components

9    and Robert Mothershead confirmed that to you yesterday.

10             Next, hydrogen peroxide.  Mr. Mothershead told you

11   that peroxide for these purposes it is better when it is more

12   concentrated.  That is what he bought, 35 percent food grade

13   hydrogen peroxide.  You see in the picture, 30 percent hydrogen

14   peroxide, $H2O2$.  He is buying what he needs to make HMTD.

15   Digital multiple function kitchen and food scale.  Bottom

16   center of the screen.  You need a scale to figure out what the

17   yield is of the explosives that you can making at home.  Next,

18   glass beaker.  Check, bought that, too.  He setting up a

19   chemical lab in his bedroom.

20             What else did he buy, ladies and gentlemen.  On

21   June 20th the defendant bought bomb shrapnel -- steel ball

22   bearings.  He bought them from eBay.  He bought them from

23   Amazon.  Do you remember when I passed this around how heavy it

24   is.  He bought this to kill people.  This shrapnel was picked

25   up all over the street on 23rd Street.  You can see that on the

Hac6rah4                    Summation - Mr. Bove

left.  On the right you can see the way it looked when it was

recoverd intact inside the 27thth street bomb.  Glued in a

sheet so that the explosives would fire it all over the seat of

the blast.

     A few days later, ladies and gentlemen, the defendant

gets the iPhone working.  This is the iPhone that he later sold

to Younus Rahimi.  He has an e-mail account where he is trying

to unlock the IMEI, the unique number assigned to each device.

This is a picture of the phone he later sold to Younus Rahimi

with the same IMEI.

     July 2nd, the iPhone backup.  Mr. Donaldson told you

about this pretty early in the trial and you can bet that the

defendant regrets having made this mistake.  Look at the folder

associated with this backup field.  This is not a folder that

is saved on a desktop of a computer.  This is not your My

Documents folder.  He didn't realize plugging in the phone

backed it up in this way.  The defendant didn't realize that he

left these traces of his crime on that lap top.  He didn't know

that he left his issues of *Inspire* magazine.  He didn't know he

left the screen shots of jihad.  He didn't realize that HMTD

cookbook was left on this lap top.  But FBI recovered it and

presented it to you at this trial.

     Throughout July and August, the defendant continued to

buy bomb parts -- more shrapnel, the electronic matches that

were found in the bomb at 27th Street, thread sealant tape for

1    the pipe bombs at Seaside, the elbow pipe in Elizabeth, and

2    some more citric acid for some more HMTD.

3            This is what I mentioned earlier when the defendant

4    sold that iPhone that he was using for some of these activities

5    to Younus Rahimi.  He made that sale because he wanted to get

6    rid of the evidence.  Remember, Younus Rahimi told you the

7    phone was on factory reset without a SIM card when he got it.

8    He also needed some more money to continue to finance the

9    attack.  So you can see that purchase happened from the bottom

10   document between August 18th and August 19th.  So this is the

11   phone with the long identifier that Mr. Donaldson described to

12   you 9C53.  That is the phone the defendant had and you can see

13   when the defendant had it, it was associated again with that

14   Timefreeze e-mail account.  There is a log-in on 18th and then

15   on the 19th Younus Rahimi has it with his e-mail account.  So

16   that is when this sale happened.

17           What is next, ladies and gentlemen?  Bomb plans.

18   These are the communications that you saw yesterday between the

19   defendant and Zobyedh Rahimi.  She makes a reference to bomb

20   plans.  You will remember from Mr. Shroff's cross-examination

21   of Mr. Calabrese when she made him read out what that acronym

22   means, LMFAO and several others.  Do you think that the victims

23   in this crime thought that was funny?  Do you think the

24   defendant's bomb plans were funny?  Was that a point worth

25   making yesterday?

1          Two days before the attack, September 15th of 2016,

2     the defendant is in his backyard testing out the explosives

3     that he made.  You saw this video from two angles, the

4     surveillance camera from 104 Elmora and the cell phone of

5     Zobyedh Rahimi.  You can see her in the picture with the phone

6     in her hand making the video that is on the right.  That

7     canister that is in the photo on the left, you know what that

8     is.  You saw it from the exemplar.  That is from the rock

9     tumbler, the rock tumbler that the defendant used in his

10    bedroom to make black powder for these bombs.

11         (Video played)

12         Look how happy that man is.  Look at the smile on his

13    face.  Two days before this attack, he knows his explosives

14    work.  The jihad that he has been thinking about since 2012,

15    that he has been reading about in *Inspire* and *Dabiq*, the jihad

16    he has been planning for months is two days away and he

17    couldn't be happier.

18         So now let's talk about the attack itself.  As I said,

19    we're going to start at 5:00 a.m. at the defendant's house, 104

20    Elmora Avenue.  This is another time where the defendant gets

21    caught by his own surveillance camera committing part of this

22    crime.  You can see in the picture on right where that

23    surveillance camera is outside the First American Fried Chicken

24    restaurant.  That is on the front of his house.  And on a flag

25    near the red box to the left where 104 Elmora is on the street.

1    That is from that surveillance camera.  On left

2    September 17th, 4:58 a.m., the defendant is walking out of his

3    house with a white trash bag.  He comes back a few minutes

4    later at 5:05 a.m.  That is what is in the trash bag, ladies

5    and gentlemen, the bomb that he detonated in Seaside.  How do

6    you know that?  Because there was a white trash bag much like

7    it in the trash can that you see on the screen at the seat of

8    the blast.  This was the defendant's first bomb load on that

9    morning.  He was carrying those bombs out to his BMW.

10    This is the second trip.  It was too heavy to carry

11    because the man had made so many explosives.  Two bags, the

12    23rd street bomb, the 27th Street bomb, and that backpack, the

13    backpack that he carried around this entire day, these two

14    bombs that he carried around the rest of the day until he

15    planted them, there they are.  The backpack has the bomb that

16    was made out of PVC that you can see the fragmentation glued or

17    taped to the top of it.  Those are nuts and bolts on top of it

18    to maximize the damage.  That is the one that you heard about

19    this morning that had HMTD in it that is so dangerous and so

20    volatile that even the bomb techs couldn't diffuse it.  It

21    exploded in Elizabeth when they found it.  Then you know what

22    these duffel bags are, the 23rd Street and 27th Street bombs.

23    I mentioned that the defendant took the BMW to go down

24    to Seaside.  This is how you know that, ladies and gentlemen.

25    There were documents with his name on them in that car.  Erin

1   Brandt told you about the search conducted on September 19th.

2   Here are some of the documents that were found.  You also know

3   that the defendant used this BMW from Younus Rahimi, who told

4   you he saw the defendant come to and leave from work in a blue

5   BMW.

6           So this is the trip that he took that morning.  He

7   goes down to Seaside Park in that car.  You know that from the

8   Garden State Parkway records.  You also know that from the

9   defendant's own iCloud.  These are the driving instructions

10  that he saved in the iCloud.  It started at Canton Street, the

11  street on the same block as his house.  These are precise

12  directions to get to Seaside Park for this bombing stored in

13  the defendant's iCloud.

14          Continues on the Garden State Parkway.  Here you also

15  have the license plate capture from the Raritan toll plaza.

16  The defendant is on the road to conduct this bombing by

17  5:29 a.m.  He exists the Garden State Parkway at Toms River,

18  6:06.  Not much traffic.  It is a quick trip.  You can see

19  we're just going right down the driving instructions from the

20  iCloud.  The destination on those instructions was the Sawmill.

21  It is a restaurant in Seaside.

22          What happens next?  The defendant walks a few blocks

23  down to C Street and plants that bomb in the trash can.  That

24  red box on Ocean Avenue and D Street is the seat of this blast.

25  You heard about that from Erin Brandt and some of the other

1    witnesses who passed through here quickly as well.

2              What was found there?  Three pipes packed with

3    explosives set off by a single detonator, one fusing system,

4    this cell phone.  Special Agent DeFusco described that to you

5    during his testimony.  The analysis was that it was wired up,

6    connected to this phone with Christmas tree lights into each

7    pipe so that an alarm or some other thing that could trigger

8    the vibrate function would send power to the Christmas tree

9    lightbulb and the Christmas tree lightbulb would detonate the

10   bombs.  You know because Special Agent DeFusco examined them

11   and explained it to you that at least one of these actually

12   went off.  You also know that from looking at this photo you

13   can see the trash can is blown out from the bomb.  There is not

14   really any question that this is a phone that the defendant

15   used.  It has his fingerprints all over it and his DNA.

16             Let's think about what has happened up to this point

17   on September 17th.  Defendant got up early.  He packed his

18   bombs in the BMW.  He drove down to Seaside Park.  He left that

19   bomb there knowing it would detonate because he had set the

20   alarm on the cell phone.  The bomb does in fact detonate and

21   now he drives back to New Jersey.  He still has the 23rd Street

22   bomb with him, the 27th Street bomb, and six more bombs in that

23   backpack.  He is back home at 104 Elmora by 10:45 in the

24   morning.  Ladies and gentlemen, this speaks volumes about his

25   intent for that day.  The man knows by this time that his bomb

Hac6rah4                    Summation - Mr. Bove

making scheme worked.  He knows that the things he built are

capable of doing what he designed them to do.

So what does he do for the rest of the day?  He gets

ready to conduct the attack here in the city.  You saw by about

5:00 p.m., he was ready to leave.  I am going to play this

video in a minute and ask you to focus on the doorway when the

defendant comes in and he tosses his keys.  Watch how confident

he is.  Watch how prepared he is to get on the train, come to

the city and detonate bombs here.

(Video played)

That is a man on a terrorist mission.  What happens

next?  Defendant takes the train from New Jersey into Penn

Station into Manhattan.  That is significant I expect you will

hear when you listen to the Judge's instructions because of the

interstate travel.  The defendant crosses the state borders

between New Jersey and New York.

Some of that train schedules are in evidence, ladies

and gentlemen.  You can see that there was one that day

departing Elizabeth at 6:03 and arriving at Penn Station at

about 6:36.  You know from the surveillance video that that is

when the defendant got there.  Look at the crowds.  When you

think about and evaluate the evidence relating to the third

category of charges, those transportation charges, the use and

carrying of bomb charges, I am talking about Count Six, Certain

and Eight, remember these pictures and remember how dangerous

1    those explosives were and think about all the risks that were

2    created by this decision to carry bombs through Penn Station at

3    this time of night on a Saturday.

4            (Video played)

5            Here are some of the video where you can see even more

6    clearly that the defendant at this point he has the 23rd Street

7    bomb in a duffel bag, the 27th street bomb, and six more in the

8    backpack.

9            (Video played)

10           Let's continue.  There are the bombs.  Where do you

11   see him next?  Coming out of Penn Station.  When I started this

12   afternoon, I talked about some of the pauses that the defendant

13   took to stay on schedule because of the way that the cell

14   phones were set up to detonate based on the alarms.  This is

15   one of the pauses.  Here it is on video.

16           (Video played)

17           Remember when I said he looked at New Yorkers walk by?

18   This is the defendant thinking about his victims, thinking

19   about his intentions, thinking about his plan for the rest of

20   that night.  He picks up the bombs and continues.

21           One of the next places you saw him on surveillance

22   video was heading south on Eighth Avenue near 25th Street.

23   This is where he took pause number two.  This one was longer.

24   It is about 20 minutes.  We'll not watch the whole video.  He

25   has a schedule.  He knows he cannot just leave these things out

1    on the street because someone will find them.  There is a

2    distinct window where you can plant it, it will be concealed

3    but it will not be found, giving him enough time to get away

4    but leaving the bomb in place so that it can go off.  He is

5    trying to meet that window.

6              (Video played)

7              So he put those bombs down.  If you look at the

8    timestamp in the bottom right we are at about 6:51 p.m.  The

9    video continues onto 7:10.  You can see the defendant here

10    standing up on the curb just to the right of that bench where

11    he set the bombs down in the video we just watched.  Now he is

12    ready to go.  He is ready to continue with his plan to head

13    down to 23rd Street.  This is not the defendant hesitating.  It

14    is not him wavering at all.  This is him staying on schedule

15    and sticking to the plan.  And there he goes.

16              He heads down Eighth Avenue, ladies and gentlemen, and

17    then over onto 23rd Street.  This is the area of the seat of

18    the blast on 23rd Street.  You heard a lot about Selis Manor at

19    135.  That was Mr. LiCastro who told you about that as well as

20    some of the residence.  You heard about 131 West 23rd Street,

21    the Townhouse Inn of Chelsea and the King David Gallery.  You

22    know the dumpster landed on other side of the street near 144.

23              Mr. LiCastro presented you with this chart to help

24    make clear where the different surveillance cameras were

25    located in the scaffolding outside of Selis Manor.  You saw

Hac6rah4                     Summation - Mr. Bove

that the defendant was picked up on each and every one of these

cameras.  He is walking towards the area where he planted the

bomb clearly both bombs in the bags and the backpack.  This

slide is to help you get oriented between the links between

video from 135, the Selis Manor video and Townhouse Inn.  The

best way to do it is stay focus on the murals and the awning in

the bottom right is the awning of the Townhouse Inn of Chelsea.

             (Video played)

             You will see the timestamp is 19:29.  So it is 7:30 on

September 17th.  The defendant walks past where he planted the

bombs.  He has both bags with him.  Remember, Mr. Ord told you

where he went and you can see it here.  He goes to sit on the

steps of the church nearby.  He knows at this point the cell

phone detonator is set for 8:30 and an hour is too long to

leave that thing out in the street.  Someone will detect it and

he is worried someone will find it and prevent it from going

off.

             So look at timestamp here.  7:30 and he sits there.

He watches people walk by on 23rd Street for about 20 minutes

with both of those bombs next to him.  That is where he is

sitting, ladies and gentlemen, right next door on the steps of

that church.  You can see from the video here where he picks up

and it is 20 minute later, 19:53, 7:53.  If you watch that

left-hand corner, you will see the defendant stand up and wheel

the bombs back.  He is going to walk past the camera and then

Hac6rah4                    Summation - Mr. Bove

1   you will see him head off the sidewalk.  He is going out into

2   the street to plant the bomb near those dumpsters that

3   Mr. LiCastro told you about because that was the place given

4   the scaffolding there and all the activity on the street where

5   he thought correctly that no one would find the bomb before it

6   went off.

7           (Video played)

8           Here he heads off the sidewalk.  You know what he did

9   after that.  You know that he planted that bomb near the

10  dumpster because the next thing that comes up is the video with

11  him holding just one bag.  He has planted the first bomb at

12  this point and he is walking away calmly from the bombsight

13  down 23rd Street.  He is has given himself enough time having

14  left at 8:00 and the alarm is set for 8:30 to get himself away

15  from it and is he also put in a position to cause as much death

16  and devastation as possible.

17          Here is the camera shots of him walking back past

18  Selis Manor.  Clearly just one bag at this point.  You know

19  what happened on 23rd Street at 8:30.

20          (Video played)

21          That video just went black because the bomb blew the

22  camera up.  This is the video from the Townhouse Inn that I

23  talked about earlier.  There are no words for this.

24          (Video played)

25          The cameras at Selis Manor picked up people on video

Hac6rah4                    Summation - Mr. Bove

1    in complete panic and shock from the bomb that went off just

2    yards away.  That is Cort Cheek.  Remember how he described

3    this?  Look at the people sprint by.  These women cannot even

4    tell which direction they have been attacked from.

5            So those were all videos from the north side of the

6    street right near where the defendant planted the bomb.  You

7    saw there was extensive damage on the south side of the street

8    as well.  These are some of the videos from Orange Theory

9    Fitness that Adam Krell talked about.

10           (Video played)

11           You see Tsitsi Merritt's car on the left?  You heard

12   about this this morning.  You window was blown out of the car

13   with a child in the back.

14           One of the things you will be asked to consider when

15   you deliberate is whether or not this bomb damaged property.

16   Do you think these pictures speak for themselves?  Glass blown

17   onto the streets.  You remember what Mr. Ord told you about the

18   bomb ripping into the basement of 131 West 23rd taking some of

19   the equipment down there and ripping it right off its concrete

20   moorings.  These are some of the vehicles that Special Agent

21   McReynolds told you about with the windows blown out, shrapnel

22   damage.  Look at the photo in the top right in the church with

23   the window blown out.

24           So while all that was happening on 23rd Street, as

25   that bomb was ripping through the street, the defendant was

 1    walking calmly to 27th and planting that bomb.  This is the

 2    route he took up Seventh Avenue and over onto 27th Street.

 3              (Video played)

 4              Here is one of the surveillance cameras showing that.

 5    You can see he has the one bomb at this point in the wheelie

 6    bag and the backpack with the bombs that were found in

 7    Elizabeth.

 8              There were cameras on 27 Street that picked up the

 9    defendant planting this bomb much in the same way that he is

10    picked up planting the 23rd Street bomb.  So here is a series

11    of stills from those cameras showing him walking down.

12              (Video played)

13              This is video from the scaffolding and you can see in

14    the top left corner there is the mailbox where the defendant

15    eventually planted the bomb.  You can watch as his feet pause

16    there as he thinks about is this the best place.  You will see

17    in the next video he pivots his hips because he is looking

18    across the street at the hotel and the restaurant and that is

19    how he decided, I submit to you, that this was the right place

20    to do this.

21              (Video played)

22              The Mailbox is right under the word "street" at the

23    top.  That is the defendant with the bag.  There he is looking

24    across the street, looking at the people at that restaurant and

25    he calmly walks away.  He walked away intending that that bomb

1    would go off in a half hour leaving himself about the same

2    window he left himself at 23rd Street.  He plans and intended

3    for this bomb to detonate in exactly the same way the 23rd

4    street one did.

5         Remember the forensic evidence found on this bomb.

6    Fingerprints not just on the pressure cooker but actually

7    inside the cell phone.  DNA on the cell phone.  Mr. McFarlane

8    told you there was an alarm set on the phone, set to vibrate.

9    You know what that would have done with this phone the way it

10   was modified.  It would have sent power on to the wires that

11   the defendant soldered on it and power to the Christmas tree

12   lightbulb that the defendant had fixed into the box and it

13   would have detonated the black powder and the HMTD that the

14   defendant made and planted in that bomb.

15        (Video played)

16        Here is another shot of the defendant now leaving the

17   seen without the bomb.  The same cameras pick him up walking

18   away giving himself a safe distance from the bomb he just

19   planted.

20        (Video played)

21        This is the video that you saw of the two men who walk

22   by and notice this.  They open up the bag.  They take the bomb

23   out.  I think you will recall vividly from this morning what

24   Special Agent DeFusco thought about the wisdom of touching this

25   device.  He said it would be like slapping a cobra.  This is

1    one the three times where it worked out okay.  This is one of

2    the absolute miracles in evidence at this trial that this bomb

3    packed with HMTD did not go off as these men jostled it.

4    Because what they did is they handled the bomb in ways that the

5    defendant hadn't up until this point.  They moved it around and

6    shook it by the pressure cooker body.  I submit to you in doing

7    that, they dislodged one of the wires, one of the parts of the

8    fusing system.

9           See the way he is handling it now?  They like the bag

10   and they took the bag and walked away with it.  They left the

11   bomb out in the open on the street.  What did that do?  It

12   allowed Ms. Schreibman to see it and it allowed her to identify

13   it and call 911 so that the NYPD could come and diffuse it.

14          Think about the timing.  The alarm was set in that

15   phone to detonate for 9:00 p.m.  These men did this at about 10

16   to.  This is what prevented this bomb from going off.  Nothing

17   that the defendant did.  The defendant had every intention of

18   this one going off like the one in Seaside and the one in 23rd

19   Street.

20          Think about what he was doing around this time.  Now

21   it is 9:06.  He is up on Seventh Avenue, 32nd and 33rd Street.

22   It is about six minutes after the alarm was supposed to go off.

23   He is probably wondering what is going on.  Why hasn't this

24   think gone off yet.

25          Remember some of the cross-examination that happened

1    of the law enforcement officers who collected evidence at 27th

2    Street, Special Agent Leung and Special Agent Jill Enyert?

3    They were asked questions about, was it really still dangerous

4    after this bomb had been diffused?  After the bomb had been

5    removed from 27th Street, was there any danger?  Was there any

6    rush?  Are you sure you didn't have time to take some more

7    notes about exactly how this happened?  This picture captures

8    exactly why they were right, why their procedures were entirely

9    appropriate.

10           The defendant for the rest of September 17th, the rest

11   of the night, walked around with a backpack full of six more

12   bonds.  As the 27th Street crime scene was being processed, he

13   was still out there with more explosives.  You heard a lot

14   about what happened at 27th Street.  Detective Hallik responded

15   to that scene.  He used a robot to remove the cell phone

16   detonator from the device.  That cell phone you heard from

17   Special Agent Leung and Enyert was collected, was taken back to

18   the crime scene setup at 23rd Street so that it could be

19   processed.  The phone was on when it was picked up.  It was set

20   to go off.  It was then recorded in evidence at the crime scene

21   and rushed down to Quantico so that it could be evaluated.

22           The bomb itself, the pressure cooker, was put in a

23   total containment vessel, brought safely to Rodman's Neck so

24   that the bomb techs could diffuse it.  They call it a

25   render-safe procedure.  They popped the lid off the pressure

1    cooker.  The real victory of that operation, what it really

2    allowed was the evidence to be preserved.  They didn't just

3    take it out into the desert and detonate the bomb.  They took

4    it apart carefully so that that evidence could be preserved and

5    so that you can see the proof of exactly what the defendant

6    build and know from that proof, know from the contents of that

7    pressure cooker what his intentions were.

8            Now, let's talk about what happens next.  The 23rd

9    Street bomb is detonated.  That crime scene is being processed.

10   The 27th Street bomb has been collected and it is in the

11   process of being diffused.  The defendant is still at large.

12   Next time that he shows up on surveillance video is at Penn

13   Station the following day.  It is about 2:50 on September 18th.

14   He still wearing the backpack.  Again, the backpack that you

15   know has six additional bombs.  This is the second time that

16   the defendant brought a load of bombs into Penn Station during

17   this case.

18           (Video played)

19           He catches a train.  Here he is at the Newark Penn

20   Station.  There is a transfer he picks up, 3:25.  Going to

21   Elizabeth at 3:35.  You can see on the video still with the

22   backpack.  The Elizabeth Train Station to be clear is within

23   blocks of 104 Elmora Avenue.  This is naturally the stop the

24   defendant would take and this is where the defendant planted

25   the rest of those bombs.

1      Now, Ladies and gentlemen, the fusing systems on these

2  bombs were different.  They weren't cell phone.  They were the

3  green hobby fuse.  The testimony was you would have to light it

4  in order to make them detonate.  Remember, that they also

5  contained HMTD.  So this is relevant for two reasons.  The

6  first is that HMTD is to volatile, as Special Agent DeFusco

7  told you already, that it could have gone off at any point by

8  shaking it around.  So leaving these types of bombs with that

9  type of explosive at a train station -- remember, it was found

10  on the 18th on a Sunday into early on the 19th.  The bombs

11  would have been right there on a crowded rush hour on that

12  Monday.  So it speaks about the defendant's intent that he left

13  an explosive mixture this volatile right near a train station.

14      It also speaks about the 27th Street device.  There

15  was HMTD in both of those and you know what happened at the

16  Elizabeth Train Station.  The bomb technicians at that crime

17  scene were not able to render safe these devices.  The one that

18  is in the red box, the one made out of PVC pipe, when they

19  tried to collect it and tried to take the top off so they could

20  empty out the explosives, it blew up.  These were devices that

21  were capable of exploding, both the 27th Street device and

22  these as well.  That is how you know that the defendant

23  intended for the 27th Street device to explode and do great

24  damage because it had HMTD in it.  That substance by itself

25  just by jostling it can go off at any time.

1          If you needed anymore proof that these were the

2     defendant's bombs at the Elizabeth Train Station, Dee J. Fife

3     provided that extensive fingerprints were found all over the

4     bomb, the tape from inside the bombs, and DNA was found on one

5     of the lighters in the backpack.

6          So now there are a few active crime scenes, the

7     bombing in Seaside Park, the bombing on 23rd Street, an

8     attempted bombing where a bomb was found at 27th Street, and

9     there are these additional bombs at Elizabeth Train Station.

10    Then you know that on the morning of September 19th, 2016, the

11    defendant was arrested and his house was searched shortly

12    thereafter.  This is a stipulation in evidence that the

13    defendant was arrested that morning on the 19th.  You know that

14    that is when the notebook was collected that contained the

15    letter that we talked about in the beginning.

16         How do you know that the defendant wrote that letter?

17    First of all, he was carrying it around with him after he

18    conducted this attack and it describes the attack that he

19    conducted.  Second, think about the way that it is written.  It

20    is written in the first person.  He repeatedly refers to

21    himself as "I" as he describes his plan.

22         Let's talk about the searches because there was

23    important evidence found after the defendant was arrested at

24    his house at 104 Elmora.  We've already talked a little bit

25    about this living room area, which the FBI called Room G during

Hac6rah4                         Summation – Mr. Bove

1    the search.  One of the things they found there was the hard

2    drive that contained the surveillance video that showed the

3    defendant testing the bombs on the 15th, showed the defendant

4    leaving to go to Seaside Park on the morning of the 17th, and

5    showed him coming back and departing again later that day.

6    They also found this Amazon box in Room G in that living room

7    but also outside the defendant's bedroom.

8            Let's talk about that bedroom.

9            THE COURT:  Mr. Bove, this might be a good time to

10   take five minutes.

11           (Jury excused)

12           (In open court; jury not present)

13           THE COURT:  Please be seated.

14           MS. SHROFF:  Your Honor, can we step out?

15           THE COURT:  Sure.

16           (Recess)

1                   (Jury present)

2                   THE COURT:  Mr. Bove, go ahead.

3                   MR. BOVE:  May I continue, Judge?

4                   THE COURT:  Sure.

5                   MR. BOVE:  Thank you.

6                   Now before the break we had started to talk about the

7       search of the defendant's house.  The first one took place on

8       the same day he was arrested, September 19.  So less than 48

9       hours after this bombing occurred the defendant was in custody

10      and the FBI was at his house looking for additional evidence.

11                  So we talked about room G and the surveillance video,

12      the hard drive that was found there.  And the Amazon box, the

13      type of box that would have been sent for the defendant's

14      Ronald Welsh purchases, the shrapnel.  We started as to talk

15      about the bedroom, the bedroom that was connected to that

16      living room.

17                  If you look at the top right photo.  There is a cooler

18      in that closet, ladies and gentlemen, packed with additional

19      identification documents from the defendant.  This was

20      defendant's bedroom and it was also his explosives laboratory.

21                  Let's start with the HMTD evidence.  You heard that

22      there was a swab taken of the plywood that you see in the photo

23      on the left.  And Mr. Mothershead told you that there was

24      residue from HMTD on that plywood.

25                  You also heard -- now I'm talking about the photo in

1    the middle -- that there was a vacuum sample taken of the

2    carpet near that electrical out let.  Again, Mr. Mothershead

3    told you HMTD residue on the carpet.  The defendant used this

4    bedroom as one of the places, one, that he made these bombs.

5          What else was in that room?  The rock tumbler.  You've

6    seen the rock tumbler that was seized from that closet.  You've

7    seen an exemplar of a rock tumbler.  There was a lot of

8    testimony about this rock tumbler.

9          What does it mean, ladies and gentlemen?  This is what

10   the defendant used to make the black powder.  You heard from

11   Mr. Mothershead that the black powder that was found in the

12   27th Street device was more fine than commercial grade black

13   powder.  Commercial grade black powder is coarse and it has a

14   coating.  This did not.  It's because the defendant used this

15   tool to mix the components together.  There was black powder

16   found on the red body of the pressure cooker, and there was

17   also the defendant's fingerprint found there as well.

18         There were other bomb-making tools, bomb-making

19   equipment found in this room:  The caulk gun that the defendant

20   used to seal the top on the pressure cooker of the 27th

21   Street bomb.  Remember Detective Hallik told you about how much

22   trouble they had at Rodman's Neck, at the bomb range, trying to

23   figure out how to pop that lid off to get the contents of the

24   bomb out safely.  And one of the reasons that it was so

25   difficult, one of the reasons this bomb was so dangerous was

1    that the defendant sealed the pressure cookers so that nobody

2    could get back into it once he had placed the explosives inside

3    of it.

4            You can also see the duct tape, the duct tape that you

5    saw on just about every bomb the defendant made.

6            I said the bedroom was just one of the places where

7    the defendant made bombs inside his house.  There was also a

8    workshop in the basement.  This is the room the FBI labeled L

9    during the search.  And one of the first things that Agent

10   Zimmerman told you about room L was that there was a big piece

11   of PVC pipe in the trashcan.  You can see that in this photo.

12           Where else did you see PVC pipe in the evidence in

13   this case?  There were fragments of it, and fragments only,

14   from the bomb that went off that was found in Elizabeth.  This

15   is the PVC pipe that was used to make that bomb that detonated

16   when the bomb techs tried to make it safe.

17           What else was in room L?  A whole lot of tools.  Saws.

18   Black electrical tape like the tape you saw on some of the

19   bombs.  Drill bits.  Those drill bits were necessary to drill

20   into the pipes.  Why?  So that the Christmas tree lights and

21   the wires could be slotted in so that those bombs would

22   detonate.  That's the way the Seaside bomb worked.  And you

23   could see that the holes in the pipe, the elbow pipe that was

24   found at Elizabeth so that the fuse, the green fuse could be

25   inserted.

1            And then remember I asked the question about the white

2    bucket that you see just on the bottom of the screen in that

3    picture?  Remember what was inside there?  Screws.  Nails.

4    Fragmentation.  This was a place where the defendant stored

5    shrapnel for the bombs that he made.

6            Also in this basement area was a notebook, a binder

7    that you saw in evidence, Government Exhibit 533.  This was a

8    notebook with the defendant's notes from a class that he took

9    about electronics.  This is how you know that the defendant had

10   the skill, the expertise to make the fusing systems that he

11   made.  These were not simple things that he did.  He soldered

12   wires.  He removed the vibrate feature out of the phone.  He

13   had the experience to do that, and you know it from this binder

14   found in the same room where the tools were that he used to

15   make the bombs.

16           And you know that this was a room he was using from

17   this suitcase.  This is another place where the defendant left

18   evidence of his identification documents, other materials

19   relating to him that prove that these are places that he was

20   using, that he had access to, and that he used in connection

21   with this crime.

22           This is all from that basement, ladies and gentlemen,

23   the PVC pipe, the tools, the frag bucket, the binder with the

24   electronics instructions, and these documents with the

25   defendant's name on it.

1          You also heard a lot of testimony about the backyard.

2     We've seen a little bit of the backyard already from

3     September 15 of 2016 when the defendant tested the black powder

4     that he was making in his bedroom out there.

5          These are the canisters on the right side from the

6     rock tumbler.  Remember the testimony about the rock tumbler

7     that was seized out of the closet and it was missing those two

8     pieces?  That's because they were burned and damaged from

9     explosives in the backyard.  This is the way they were found

10    back there, along with burnt electronics, like cellphones that

11    the defendant was trying to get ride of because he was

12    concerned that he was going to be caught before he could

13    conduct this attack.

14         Look at the bottom of the screen.  Look at the siding

15    on the house.  The defendant's been testing explosives back

16    there to such an extent that the siding was getting melted on

17    the house at this point.

18         Now, I want to talk in more detail about how these

19    bombs were made, the different pieces that put them together.

20    The reason that I want to talk about this is it shows that they

21    were sophisticated and that the defendant understood that they

22    would kill people if they detonated.  The defendant put them

23    together to do just that, intending to commit all of the crimes

24    that he's charged with.

25         Judge Berman is going to instruct you about the

different definitions that you need to be considering, things
like explosives, weapons of mass destruction, destructive
devices.  Those are definitions that we'll talk about in a bit.

The different components of these bombs, although
they're somewhat technical, are not necessarily legal
requirements that you've got to consider.  They just help to
show you that the defendant was himself a sophisticated
bombmaker.

So you heard about the different components that go
into an improvised explosive device, which is just a fancy term
for a homemade bomb.  You heard this from Special Agent
DeFusco.  These are the things that we saw in this case.  An
outer container, an inner container, a fusing system, some kind
of explosive, and fragmentation.

So let's talk about what each of those pieces are and
how the defendant used them.

The evidence of that starts with an article from
*Inspire* magazine that was on the defendant's laptop, Make a
Bomb in the Kitchen of your Mom.

And this article was published by AQAP to help people
like the defendant learn how to make bombs with the ingredients
that you would find in your house, so that you could do, as the
defendant said, "an attack on the kuffar in their backyard," in
the United States, without having to go any place for any
specialized training, without needing access to a lab or any

1    kind of special chemicals.  This article provided the

2    instructions, and the defendant followed almost all of them.

3           Let's start with the outer container.  An outer

4    container is basically just a concealment bag, a way to hide

5    the bomb so that it doesn't get detected after it's planted.

6    Where did the defendant get the idea from this?  From the

7    article itself.  This is not an excerpt from the article, and

8    there's a red box around one of the pictures from it.  The

9    article itself recommends placing the bomb in a bag so it can

10   be left on the street and people will just think it's a normal

11   item.  And you know that that's exactly what the defendant did

12   at 23rd Street and at 27th Street.  That's why it is so

13   critical to the safety of the people who were on 27th Street

14   that those two men picked the bag up and took the bomb out.

15   That is the way that that bomb got discovered.  So here is a

16   picture on the left, the defendant with the two outer

17   containers, the concealment bags.

18          These are two pictures of some of the evidence that

19   was collected from 23rd Street.  This evidence came in

20   through Special Agent Macdonald.  And you were probably

21   wondering at the time, given everything else that was found on

22   23rd Street -- cellphone fragments, Tannerite labels, ball

23   bearings -- why are we talking about some pieces of cloth?

24   That's because these are the pieces of the bag that the

25   defendant used to hide the bomb.  Those were collected.

1  Remember, it includes a zipper.  These were collected because

2  they are components of the outer container of this bomb.

3          What's an inner container?  In this case the defendant

4  followed the advice of *Inspire* magazine.  He followed this

5  article and he used pressure cookers.  You can see in the red

6  box on the top the article recommends:  The pressurized cooker

7  is the most effect method.  Method for what?  A lone wolf

8  terrorist attack to kill Americans.

9          There's a picture of a pressure cooker in the article,

10  and you know that the defendant used pressure cookers in both

11  bombs.  There were pressure cooker valves found on 23rd

12  Street and 27th Street you have the entire pressure cooker

13  body before you.

14          A fusing system is kind of like a fancy word for a

15  detonator, the way that the defendant set up the bomb so that

16  it would go off.  In this case, at 23rd Street and 27th

17  Street, as well as at Seaside Park, the defendant used

18  cellphones with alarms.

19          How did this work?  Well, first you need a power

20  source, something to provide enough electricity to light that

21  Christmas tree lightbulb.  The cellphone battery does that.

22  And Mr. Mcfarlane testified that the batteries at issue in this

23  case were sufficient to provide enough electricity to light

24  those Christmas tree lightbulbs.  That was the point of that

25  testimony; that he did the test to make sure that these two

1    types of phones, the LG440 that was used at Seaside and 23rd

2    Street and the Samsung that was used at 27th Street, that

3    they could, would, in 27th -- in the case of 23rd Street

4    did -- do that job.

5         How?  An alarm goes off on the phone and it sends some

6    current out to the place where the vibrate motor is supposed to

7    be.  The defendant removed those motors so that the current

8    would go to the wires that he soldered onto the circuit board.

9         What happens next with that current?  It goes to the

10   Christmas tree lightbulbs that he also connected.  What happens

11   then?  The Christmas tree lightbulb lights up, but the

12   lightbulb itself is broken, so the filament is exposed to the

13   explosive and that's when the bomb detonates.  That's how the

14   23rd Street bomb went off and that's how the 27th Street

15   bomb was designed to go off.

16        These are the pieces of evidence that show you the

17   different fusing systems.  First from 23rd Street there were

18   only fragments because that bomb went off of the cellphone.

19   You saw the back of the phone with the IMEI label.  The next

20   picture down is the cover of the phone.  And then, finally, the

21   third picture on the bottom is from the cellphone battery, the

22   power source.  And the picture on the right you know that that

23   piece of evidence was recovered in full from 27th Street in

24   light of the render-safe procedure that removed that phone

25   before the bomb was further detonated -- excuse me, further

1    rendered safe.

2          Christmas tree lightbulbs.  This is right out of,

3    again, the *Inspire* play book.  This is the advice they gave,

4    and this is the evidence that was found.  Christmas tree

5    lightbulbs were in the 27th Street bomb.  Christmas tree

6    lightbulbs were found at Seaside.  The defendant is using the

7    same methodology, the same bomb design three times, Seaside,

8    23rd Street, 27th Street.  We don't have the lightbulb from

9    23rd Street likely because it was destroyed in the blast that

10   the defendant caused.

11         Let's talk a little bit about the evidence relating to

12   these phones.  So, as I said, the phone that was recovered in

13   Seaside, the same make and model of the phone that the

14   defendant used at 23rd Street, an LG 440 phone.  And there's

15   a record in evidence that shows you that those two phones were

16   sent to the same Family Dollar store in Perth Amboy,

17   New Jersey.  And look at the screen about where that Family

18   Dollar was.  Blocks away from where the defendant worked and

19   blocks away from this 12 Harbor Terrace address where the

20   defendant used to have an apartment.  This is where the

21   defendant bought two of the phones that he used to detonate

22   these bombs.

23         This is some of the evidence relating to the 27th

24   Street phone.  So because it was recovered intact, we were able

25   to determine what the IMEI, the identification number, was for

1    the phone.  And this phone, too, was linked to Perth Amboy.

2    This is that 12 Harbor Terrace address that I was just talking

3    about.  You can see it in the bottom right of the screen.

4         Now this record indicates that the billing party is

5    Mohammed Rahimi, somebody other than the defendant.  But look

6    at when this phone was active.  See the dates in the red box,

7    2010, 2013, 2011.  This is a phone that was being used actively

8    years ago.  Then it was sitting in one of these houses, 12

9    Harbor Terrace, maybe 104 Elmora.  The defendant had access to

10   it and he decided to use this in the 27th Street bomb.

11        This is some of the evidence that you saw from that

12   phone itself.  Mr. Mcfarlane told you there was an alarm record

13   in the phone set for 9 p.m., set to detonate the bomb on 27th

14   Street.  That's how you know that he intended to cause an

15   explosion, to cause death, and to cause property damage when he

16   planted that bomb.

17        Now there was testimony about not being able to tell

18   what the specific time on the phone was set for because the

19   battery had been removed before it was brought down to

20   Quantico.  But that doesn't affect the time of the record, the

21   alarm record that was set.  So whatever the time was before or

22   after that battery removed, the evidence that is most

23   pertinent, I submit, is that that thing had an alarm on it set

24   to go off at 9 p.m.

25        You also saw and heard from Dee J. Fife and Heather

1    LaSalle that the defendant's fingerprints and DNA were on this

2    phone.  The fingerprints, this is the testimony where the

3    fingerprints are up inside the screen.  This is more evidence

4    that the defendant built these bombs himself.  He's a

5    sophisticated bombmaker who understands how to put these things

6    together and he understands what they will do.  He knew what

7    would happen when that 23rd Street bomb went off and he fully

8    expected the same thing to happen when he planted that bomb at

9    27th Street.

10          Let's talk about the explosives the defendant used.

11   Starting with the guidance from Make a Bomb in the Kitchen of

12   your Mom, the article is clear you don't have to use one

13   substance, and in this case the defendant didn't.  One of the

14   reasons that he didn't was that the pressure cooker required a

15   lot of explosives.  And you see this is a concern raised in the

16   article.  In order to fill, for example, a pressurized cooker,

17   you may want to use gun powder, powder from fireworks, but it

18   might take more than one substance.  And that's what we saw

19   here.

20          On 23rd Street the defendant used ammonium nitrate,

21   a high explosive.  And on 27th Street, as we've been talking

22   about, a mix of the black powder that he made at his house and

23   also the HMTD that he made in that bedroom.

24          This is some of the evidence that helps to show you

25   that the defendant use ammonium nitrate in the 23rd Street

bomb.  They are the fragments of the Tannerite label that were

recovered on the street.  And, remember, not just recovered

near the scene of the blast, blown all the way across the

street to the south side of the street a few yards down from

where the dumpster landed.

How do you know that the defendant was thinking about

making ammonium nitrate based explosives?  From the laptop.

Here are two of the images from the laptop.  He's looking at

detonators anonymous.  There's an 84 percent ammonium nitrate

explosive on the left photo, and then on the right there's

another picture from explosives.net with an explosive that

involves the chemicals ammonium nitrate and diesel.

So this is what the defendant planned for the 23rd

Street bomb and this is why that bomb caused as much damage as

it did.  You heard the testimony from Mr. Mothershead and from

Special Agent DeFusco about how powerful ammonium nitrate is as

an explosive and you saw exactly the extent of the damage that

it did.

This is another document that shows you the defendant

was thinking about using ammonium nitrate as an explosive at

23rd Street.  This one is from his iCloud.  And in the red

box you can see more instructions about ammonium nitrate based

explosives.

Now let's talk a little bit more about the black

powder and the HMTD.  We've already talked about the rock

1    tumbler.  The defendant used that to mix up the black powder.

2    There was a black powder residue on the rock tumbler as well as

3    his fingerprints.

4           Yesterday you saw these pictures from the defendant's

5    laptop.  Step-by-step instructions for making HMTD.

6           I showed you earlier the way that the purchases the

7    defendant made and the Ronald Welsh Amazon account line up

8    exactly with the tools that he needed to make the HMTD that was

9    found in this explosive.

10          In case the pictures weren't clear enough

11   instructions, the defendant also wrote them down in the same

12   note from his iCloud account.  So this is text above the

13   ammonium nitrate instructions.  These are the ingredients for

14   making HMTD.

15          So you can tell from this document the defendant is

16   thinking about these things together.  It's one single attack.

17   These are the explosives he's thinking about using.  These are

18   the explosives that he did, in fact, use.  Ammonium nitrate at

19   23rd Street.  HMTD and black powder at 27th Street.

20          This is a photo we looked at when we resumed from the

21   break, the different evidence of the residues that were found

22   in his bedroom, in his laboratory and on the rock tumbler.

23          Now let's talk a little bit about the fragmentation.

24          *Inspire* is clear about this.  This is also from the

25   article.  You need to also include shrapnel.  The best shrapnel

1    are the spherical ones.  As you can see in the figures, you

2    need to glue them to the surface of your canister.

3          The defendant followed this instruction exactly.

4    That's exactly what he did.  You knew that from all the

5    fragmentation, the shrapnel, the ball bearings that were picked

6    up on 23rd Street.  That was additional testimony from

7    Special Agent Macdonald talking about how these things were

8    found almost all the way to Sixth Avenue, blown all over the

9    street.

10         And then you were able to see from the 27th Street

11   device exactly what it looks like when the defendant glued the

12   ball bearings together, put them in a sheet, and packed them in

13   the device because that sheet with the adhesive was recovered

14   intact out of the bomb when it was defused at Rodman's Neck.

15         So that was the evidence about the specific details of

16   the explosives, the evidence that shows you that they were

17   designed in a sophisticated way.  They were designed based on

18   the playbook, the blueprint provided by terrorists and so they

19   reflect that the defendant built them in order to conduct a

20   terrorist attack designed to kill people here in the U.S. and

21   to damage property.

22         Now let's talk in a little bit more detail about the

23   charges.

24         Now, as I said in the beginning, Judge Berman is going

25   to instruct you on the law.  Whatever Judge Berman says

controls.  I'm going to talk a little bit about each charge and
some of the things that I believe that we are required to prove
and the evidence that we have provided to you to establish
those elements.

Let's start with the charges that relate to the 23rd
Street bombing.

So Count One charges the defendant with using a weapon
of mass destruction at 23rd Street.  And these are summaries
of the elements that I expect Judge Berman will instruct you
that the government's required to establish.

And the first is that the defendant knowingly used a
weapon of mass destruction.  And listen to Judge Berman when he
provides you with the definition of weapon of mass destruction.
It's straightforward.  It sounds something like this.  Any
explosive bomb or similar device will suffice for purposes of
that element.  And you know that the defendant employed a
weapon of mass destruction at 23rd Street because the bomb,
in fact, went off.

There's really no question that the weapon of mass
destruction was deployed against people and property in the
U.S.  It went off on 23rd Street and you saw the damage that
it did.

The third thing you'll be required to consider is
whether the defendant had lawful authority to use a weapon of
mass destruction.  And that's why we talk about these bombs in

1    terms of improvised explosive devices, homemade bombs.  He was

2    absolutely not authorized to use any of these materials in the

3    way that he did.

4            Finally, the last element requires proof of use of it

5    in interstate commerce.  And I expect Judge Berman will

6    instruct you that this includes transportation, transportation

7    like the train that the defendant took from New Jersey into

8    New York.

9            Count Three also relates to the 23rd Street bombing.

10   This one charges bombing a place of public use.  And these are

11   some of the elements that you'll be asked to consider.  Whether

12   the defendant knowingly placed or detonated an explosive in a

13   place of public use.  And, again, here I expect Judge Berman

14   will instruct you that the definition of explosive is broad and

15   it applies to things like bombs and chemicals that may cause

16   explosions.  And these are elements that are easily met at

17   23rd Street because of the ammonium nitrate residue that was

18   found there, because you saw the Tannerite label which

19   indicates that ammonium nitrate was used, and you saw the

20   evidence from the laptop that the defendant was looking up how

21   to make ammonium nitrate explosives.

22           Place of public use I expect Judge Berman will

23   instruct you involves any place that's accessible to the public

24   such as a business.  So when you consider that element think

25   about the Townhouse Inn of Chelsea.  Think about Orange Theory

1    Fitness.  Think about the businesses on 23rd Street that were

2    impacted by the bomb that detonated.

3            Next you'll be asked to consider whether the defendant

4    intended to cause death or serious bodily injury or extensive

5    destruction resulting in major economic loss.  The defendant

6    did, in fact, cause extensive destruction resulting in major

7    economic loss.  And the way that he put this bomb together with

8    the fragmentation that it included shows you that he intended

9    to cause much more than that.  He intended to kill and he

10   intended to cause serious bodily injuries, injuries like the

11   one you heard about from Helena Ayeh.  Remember what she told

12   you about what happened to her eye.  She paused and asked

13   questions of people around her about whether she still had an

14   eye because of the piece of shrapnel from the defendant's bomb

15   that struck her in the face, struck her in the face just yards

16   away from where the dumpster landed right outside her doorstep.

17           Next you'll be asked to consider for this charge

18   whether the offense took place in the United States.  That one

19   is plainly met.

20           And finally the last element I expect Judge Berman

21   will instruct you that you need to think about whether this was

22   an attempt by the defendant to compel the U.S. Government to

23   act or the victim is a foreign national.

24           So on the first point, was this an attempt by the

25   defendant to compel the U.S. Government to act.  When you

1    consider whether that's the case, think about the defendant's

2    letter.  The defendant wrote a letter in this case on the first

3    page directed to the U.S. Government.  That is how you know

4    that he intended through this attack to cause the U.S. to

5    change the way that it was operating.

6            You also know that from his terrorist propaganda.

7    Because that is all about what Anwar al-Awlaki, al-Adnani and

8    bin Laden were talking about, changing U.S. policy, compelling

9    the U.S. Government to change the way it's acting.

10           The defendant was driven by these terrorist motives.

11   You saw that from the evidence on his laptop, *Inspire* magazine,

12   and you saw that from the letter.  And that's why this element

13   is satisfied.

14           In the alternative, we can establish this element by

15   showing that one of the victims was a foreign national.  You

16   heard from Ms. Merritt this morning.  Not a citizen of the

17   United States.  So this element is easily satisfied.

18           Count Four, ladies and gentlemen, also in this group

19   relating to the 23rd Street bomb.  This is a charge that

20   relates to destruction of property by explosive.  And the first

21   thing that you'll be asked to consider is whether the defendant

22   used an explosive to damage or destroy property.

23           The bomb went off, ladies and gentlemen.  This element

24   is satisfied.

25           Was property used in interstate or foreign commerce.

1    Again, think about the businesses on 23rd Street that were

2    impacted.  Think about what Eric Ward told you about the

3    business that was going on at the Townhouse Inn of Chelsea.

4    That was the week of the United Nations conference.  The Inn

5    was packed.  And I believe he said 11 of the 13 rooms were

6    booked with international guests.  Those are people who you can

7    consider as victims in the previous count because they were --

8    the Inn had to shutdown because of the attack.  You can

9    consider them here and the commerce that they brought when

10   you're thinking about whether this element is satisfied.

11          Next, you'll be asked if the defendant acted

12   maliciously.  Ladies and gentlemen, the defendant placed a bomb

13   on 23rd Street packed with shrapnel.  You saw what it did.

14   You saw the impact that it had on the victims.  When you hear

15   Judge Berman's instruction about what maliciously means you'll

16   have little doubt that this standard is met.

17          Was there personal injury?  Think about Ms. Ayeh.

18   Think about other witnesses who told you that they still have

19   shrapnel in their bodies, like Ms. Wilson.  There were absolute

20   injuries sustained as a result of the attack on 23rd Street.

21          Now let's talk about the 27th Street charges.  There

22   are two of these.  Count Two charges the defendant with using

23   or attempting to use a weapon of mass destruction at 27th

24   Street.  So one of the things that you'll be asked to consider

25   is whether the pressure cooker that was recovered there is a

1    weapon of mass destruction.  And you know that the answer to

2    that is yes because it was taken apart and you were able to see

3    it in different pieces, the explosives that were placed in it,

4    the detonator that the defendant set to make it go off, the

5    frag, the shrapnel, the ball bearings that he packed in there

6    designed to kill people.  This was clearly a weapon of mass

7    destruction.  And the question will be whether the defendant

8    used or attempted to use it.

9            And here, again, you'll have to think about whether

10   the defendant intended to use it.  He planted it, ladies and

11   gentlemen.  He obviously intended to use it.

12           And whether or not he took a substantial step towards

13   doing so.  He walked that bomb from Penn Station down to 23rd

14   Street, back up to 27th Street and left it there.  Numerous

15   substantial steps that satisfy the requirement for an attempt

16   for Count Two.

17           The remaining elements are straightforward.  He left

18   it on 27th Street.  So it was plainly used against a person

19   or attempted to be used against a person or property in the

20   U.S.  Like the 23rd Street bomb, this was an improvised

21   explosive device.  The defendant did not have authority to use

22   it.  And, again, interstate commerce here includes

23   transportation, the trains.

24           Count Five charges the defendant with attempted

25   destruction of property by an explosive at 27th Street.  So

1    here you'll be asked to consider whether he used an explosive

2    in an attempt to destroy the property.

3           The black powder was an explosive, ladies and

4    gentlemen.  The HMTD was an explosive.  The way the defendant

5    configured it in the pressure cooker was a bomb, a bomb with a

6    detonator that he set to go off at 9 p.m. on September 17th.

7    That's why this element is satisfied.

8           Property here, as well, was used in interstate

9    commerce because of the shipments, the products that were

10   ordered to build these bombs.

11          And then here's the definition of maliciously.  That

12   the defendant used the explosive with intent to cause damage or

13   harm or in reckless disregard to the likelihood of damage or

14   harm.

15          When you pack the number of ball bearings into a

16   pressure cooker bomb that the defendant did, you obviously

17   know, he obviously knew that if this bomb detonated it would

18   have hurt people and potentially kill them in the same way that

19   the bomb destroyed property and injured people on 23rd

20   Street.

21          So as you think about whether the defendant acted with

22   intent to detonate this bomb on 27th street I ask -- these

23   are the pieces of evidence that I ask that you consider.  The

24   alarm was set.  The defendant placed that bomb with an alarm to

25   make it go off.  It was packed with shrapnel.  This is a

picture of some of the shrapnel that was inside it. And glued together in a sheet just like *Inspire* magazine told the defendant to do.

And then think about the letter. The letter doesn't say bombs may be planted. I'm thinking about planting bombs. I might get around to it. The defendant says "bombs will be heard in the streets." He wrote "your people will hear the bombs." The defendant wrote down his intent. He committed it to writing in the letter.

And, lastly, when you think about whether the defendant acted with intent to kill, with intent to destroy, with intent to cause devastation when he planted the bomb at 27th Street, think about the steps that he actually took. You need a pressure cooker. You buy 8,000 ball bearings. You glue them together. Look at this. These are the ball bearings, ladies and gentlemen. You glue them together based on the guidance of a terrorist propaganda magazine. You pack them inside with black powder and HMTD. You take a cellphone, take it apart, take the vibrate motor out, solder wires onto the phone, hook it up to a Christmas tree lightbulb, put the cover on, caulk it shut, run the wires through this main hole, set the alarm for nine o'clock. And you leave this on the street. That's what he did twice. And he did it at 27th Street knowing that that bomb worked at 23rd Street and that the bomb had worked at Seaside. He knew that his cellphone

1    detonators worked and he knew exactly what this would do.

2           And so when you're deliberating and you're asked to

3    consider whether this man intended to kill and harm and do

4    damage at 27th Street, think about the steps, the individual

5    steps that that actually required, to purchase these things, to

6    get them to Perth Amboy, to get them to his house, to make the

7    HMTD in his bedroom, to package this all together, to glue that

8    shrapnel together on the advice that it would cause more harm,

9    it would increase the potential that you would kill people.

10   And then think about the defendant.  Think about that video of

11   him leaving this near the mailbox on 27th Street, hidden in a

12   bag so it looked normal, knowing that he had already detonated

13   a bomb at 23rd Street and he had already done another one

14   that morning in Seaside.

15          The defendant knew and intended that the 27th Street

16   bomb would go off and that's why he's guilty of the charges

17   relating to that device, the attempt charges, because he

18   intended to do it and he took numerous steps in furtherance of

19   that.

20          Let's talk about the third category of charges, the

21   ones that relate to the transportation, use, and possession of

22   these bombs.  And these are some of the pictures that I asked

23   you to think about where the defendant is transporting bombs

24   through Penn Station in crowded areas around Penn Station.

25          So Count Six relates to the interstate transportation

1    and receipt of explosives.  And, again, you'll be asked to

2    consider whether the defendant transported an explosive.

3    You'll be asked to consider that term.

4         The defendant transported an ammonium nitrate

5    explosive in the 23rd Street bomb, black powder and HMTD in

6    the 27th Street bomb, and he also transported, let's not

7    forget about the backpack, similar substances, six additional

8    bombs strapped to his back walking through Penn Station.  Did

9    he transport it in interstate commerce?  New Jersey to New York

10   on the train.

11        And did he do so with knowledge or intent that the

12   explosive would be used to injure an individual or unlawfully

13   destroy a building, vehicle, or property?  Absolutely.

14        Counts Seven and Eight relate to carrying a

15   destructive device in furtherance of a crime of violence.

16   These are additional charges that relate to the use, carrying,

17   and possession of bombs, additional charges intended to focus

18   on the conduct where the defendant was carrying these things,

19   transporting them around before he planted them, before he

20   planted them at the 23rd Street and before he planted the

21   bomb at 27th Street.  You saw him do that on the video.

22        And so one of the things that you'll be asked to

23   consider is whether the defendant committed a crime of

24   violence.  And so the crimes of violence that are charged are

25   Counts One, Three, and Four for 23rd Street and Two and Five

1    for 27th Street.

2            And then the next element is whether the defendant

3    knowingly used or carried a destructive device during and in

4    relation to or knowingly possessed a destructive device in

5    furtherance of a crime of violence.

6            Ladies and gentlemen, when you consider this charge

7    think about the video of the defendant wheeling these bags

8    around to the locations where he planted them.  Think about the

9    defendant wheeling the bags full of bombs through Penn Station

10   down Eighth Avenue.  He plants the 23rd Street bomb, still

11   carrying the 27th Street bomb, walks back up Seventh to

12   27th and plants that one also.  Consistent.  He was carrying

13   in possession throughout the attack in Manhattan.  He was

14   carrying in possession that, as I said in the beginning,

15   created grave additional dangers to all the people on the

16   street that night.  Not just the people on 23rd Street, the

17   people on those avenues, the people in Penn Station, and that's

18   why there are additional charges relating to this conduct.

19           Now, ladies and gentlemen, I'm going to sit down

20   pretty soon.  I'm just about done.  Before I do that I want to

21   say a little bit about some of the defense arguments that

22   you've heard so far.  As I've already said today, the defense

23   has no burden here.  The defendant is presumed innocent.  The

24   government has the burden of proof.  We must establish that

25   he's guilty beyond a reasonable doubt.

1           When arguments are made, again, you should scrutinize

2    them.  Think about whether they make sense.  And please think

3    about the defense arguments that are made in this case that

4    have been made already in this context.  This is the guidance

5    from *Inspire* magazine about what to do in a situation like the

6    one the defendant is in right now.  "Tips for our brothers in

7    the United States of America.  Have a convincing cover story

8    for anything suspicious.  The story needs to be good enough to

9    convince a jury if you ever get that far."

10          I submit to you, ladies and gentlemen, that the story

11   is not good enough.  These are some of the arguments that

12   you've heard so far.  In opening statement the defense tried to

13   characterize the evidence as tiresome and repetitive.  We've

14   already talked about that.

15          You heard some cross-examination of Special Agent

16   Steven Fullington about whether Mayor DeBlasio and Governor

17   Cuomo were at the crime scene.  That cross-examination was

18   designed to distract you, to distract you from the evidence

19   that was collected at that scene and the evidence that proves

20   that the defendant is the one who did this.

21          You also will recall that there was extensive

22   cross-examination of Special Agent Ken Leung about the way that

23   he safeguarded the 27th Street phone after Detective Hallik

24   removed it from the bomb.  Ladies and gentlemen, that was also

25   a distraction because the next day Special Agent Jill Enyart

1    testified and explained to you that she responded to that

2    scene, collected the phone, she was the evidence collection

3    person, and insured that it made it down to Quantico so that it

4    could be safely considered.

5              The arguments that have been presented to you so far

6    are intended, I submit, to distract you from the evidence, the

7    evidence in this case that proves that the defendant is guilty.

8              Ladies and gentlemen, I'm going to stop where I

9    started today.  On September 17 of 2016 the defendant conducted

10   a multiphased terrorist attack, an attack that began in

11   Seaside, continued at 23rd Street, and on to 27th Street.

12   He built these bombs for months.  He built them with the

13   guidance of terrorist organizations.  He packed them with

14   shrapnel designed to kill as many people as possible.  It is

15   nothing short of a miracle that no one died in this attack and

16   not in any way a defense for this man.

17             The defendant conducted these bombings.  You know that

18   from the letter, from the video, from the fingerprints, from

19   the DNA, from the laptop, from the iCloud, from the evidence

20   from his house.  At each and every step of this investigation

21   evidence was collected, evidence was obtained that proves that

22   this is the man who committed these crimes.

23             This is not a close case, ladies and gentlemen.  The

24   evidence proves that the defendant is guilty beyond a

25   reasonable doubt of each and every charge in the indictment.

HAC9RAH5

1          We thank you for your time and attention up to this

2     point during the trial and today during my closing.

3          I ask that you follow Judge Berman's instructions on

4     the law.  Listen to them carefully and apply them.

5          Use your common sense as your deliberate, the same

6     common sense that you use in your everyday lives.

7          As you think about a situation where a man was caught

8     on tape, with his fingerprints all over the bombs, his DNA all

9     over the bombs, bomb making instructions on the laptop, on the

10    iCloud, bomb residues in his house, if you apply your common

11    sense to that situation and follow Judge Berman's instructions,

12    then I submit to you that the only appropriate verdict is

13    guilty, guilty on all charges.  Thank you.

14         THE COURT:  Thanks, counsel.

15         So we're going to adjourn for today.  So tomorrow

16    morning when you come, 9:15, as soon as we start we'll hear

17    from the defense.  Then the government gets a brief rebuttal

18    after that.  Then I will give you the instructions, the law

19    that applies in this case, and then you'll begin your

20    deliberations.  So that will probably be sometime around

21    lunchtime.  We'll give you menus in the morning and order lunch

22    for you for your lunchtime and deliberation.

23         So between now and then let me just remind you what

24    I've said just about everyday that you've been here.

25         First, please don't talk to each other about the case

HAC9RAH5

1   or about anyone who has anything to do with it until the end of

2   the case when you go to the jury room to decide or deliberate

3   on your verdict, which will be tomorrow.

4           Second, do not talk with anyone else about the case or

5   about anyone who has anything to do with it until the trial has

6   ended and you've been discharged as jurors.  You remember I've

7   said that by talking I'm also referring to e-mailing, texting,

8   tweeting, or blogging.  And I'm referring to any type of

9   communication in any type of forum including Facebook, MySpace,

10  Instagram, YouTube, etc., for example.  And, additionally, do

11  not remain in the presence of other people who may be

12  discussing the case face-to-face orally or online.  And anyone

13  else includes members of your family and your friends and

14  embraces social media.  You may tell them that you are a juror

15  in a case but please don't tell them anything else about the

16  case until you've been discharged by me.

17          Third, do not let anyone talk to you about the case or

18  about anyone who has anything to do with it; and if someone

19  were to try and talk to you about the case, please report that

20  to Christine or me immediately.

21          Fourth, do not read any news or internet stories or

22  articles or blogs or listen to any radio or TV or cable TV or

23  internet reports about the case or about anyone who has

24  anything to do with the case.

25          Fifth, do not do any type of research or any type of

HAC9RAH5

1    investigation about the case on your own.

2              So, we've made very good progress and I'll see you

3    tomorrow morning.   Thanks a lot.

4              (Continued on next page)

HAC9RAH5

1              (Jury not present)

2              THE COURT:  Please be seated for a minute.

3    Ms. Shroff, you will be up tomorrow morning; is that right?

4              MS. SHROFF:  One of us will be.

5              THE COURT:  One of you.  Okay.

6              Then brief rebuttal from the government.

7              MR. DeFILIPPIS:  Yes, your Honor.

8              THE COURT:  So the jury instructions that we discussed

9    will be printed.  It's my practice to make them available to

10   the jurors, to each juror.  So there you have it.  So see you

11   tomorrow.  Thanks.

12             (Adjourned to October 13, 2017 at 9:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

DAVID P. DEFUSCO

Direct By Ms. Crowley  . . . . . . . . . . .1382

TSITSI MERRITT

Direct By Ms. Crowley  . . . . . . . . . . .1396

GOVERNMENT EXHIBITS

Exhibit No.                              Received

202-29A   . . . . . . . . . . . . . . . .1401

202-29B   . . . . . . . . . . . . . . . .1401