UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AHMAD KHAN RAHIMI,
   a/k/a "Ahmad Khan Rahami,"

                      Defendant.

16 Cr. 760 (RMB)

# THE GOVERNMENT'S SENTENCING MEMORANDUM

                                        GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York
                                        *Attorney for the United States*
                                                 *of America*

Emil J. Bove III
Shawn G. Crowley
Andrew J. DeFilippis
      Assistant United States Attorneys
      *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

AHMAD KHAN RAHIMI,
   a/k/a "Ahmad Khan Rahami,"

                             Defendant.

16 Cr. 760 (RMB)

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Ahmad Khan Rahimi, which is scheduled for February 13, 2018. On October 16, 2017, following a two-week jury trial, Rahimi was found guilty of all eight counts in the Indictment. These charges arose from the bombing and attempted bombing the defendant carried out in New York City on September 17, 2016, which caused injuries to more than 30 people and hundreds of thousands of dollars in property damage. Evidence presented at trial revealed that the defendant's attack was motivated by a violent ideology espoused by terrorist leaders like Usama Bin Laden and groups like al Qaeda, Islamic State in Iraq and al Sham ("ISIS"), and al Qaeda in the Arabian Peninsula ("AQAP"). The defendant's September 17, 2016 attack on New York was the culmination of his years-long pursuit to follow these groups' directives to carry out *jihad*, or holy war, against the United States and kill as many Americans as possible.

Moreover, since his arrest and conviction, the defendant has failed to show remorse for his crimes, and has instead attempted to radicalize his fellow inmates and made light of his attacks. In short, the defendant's conduct before, during, and after his attacks on this city militate for a sentence of life imprisonment – the sentence required by statute.

## II. Factual Background

### A. The Defendant's Terrorist Attacks

Ahmad Khan Rahimi's path to *jihad* began long before he carried out his attacks. The defendant began researching terrorist ideology in 2012. He reviewed online materials relating to terrorism, violent *jihad*, and war against the United States, including "The Book of Jihad," which taught that "Jihad against *Kufar* is among the greatest of deeds." He sent to family members speeches by Anwar al-Awlaki, a now-deceased senior member of AQAP, who encouraged his followers to "go to Jihad" and commit acts of martyrdom. And he collected online videos depicting and calling for terrorist attacks, including one titled "It's Time For a Beheading" and "muslim beheading Christian" and another capturing a bombing attack on a U.S. military base in Afghanistan.

In 2015 and 2016, the defendant searched the Internet for information related to *jihad*, bomb construction, and terrorist attacks. He downloaded every issue of *Inspire* magazine, a publication by AQAP that it used to disseminate its terrorist propaganda and call on its followers to carry out attacks against the West. One issue of *Inspire*, first released in the summer of 2010, contained an article titled, "Make a bomb in the kitchen of your Mom," by "The AQ Chef," which provided detailed instructions for making the types of bombs the defendant used in his attacks.[1]

---

[1] Two of the most recent issues of *Inspire* evaluated and praised the defendant's bombings and provided detailed instructions for those seeking to carry out similar attacks. *See* Ex. A (*Inspire* issue 16) at 5-8 (commending the defendant for, among other things, executing his attack "a few days after the 9/11 anniversary attacks . . . because carrying out the operation during the same days of the 9/11 anniversary increases the sense of fear, insecurity and brings back the past memories in details; especially when the operation targeted the same place – Manhattan"); Ex. B (*Inspire* issue 17) at 17 (citing as one of the "strengths" of the defendant's "operation" that he used "explosives as a weapon to terrorize the enemy).

In the summer of 2016, the defendant began to construct those bombs. He purchased their components online, including electronic matches, circuit boards, cables, citric acid, and thousands of ball bearings. He researched recipes for mixing chemicals and making explosives. (Probation Office Presentence Investigation Report ("PSR") ¶¶ 27, 28.) He acquired the cellphones he used to trigger his devices. And on September 15 – two days before carrying out his attack – the defendant tested some of the components of his bombs in his backyard in Elizabeth, New Jersey. (PSR ¶ 30.)

At approximately 5:00 a.m. on September 17, 2016, the defendant traveled from Elizabeth to Seaside Park, New Jersey, where he planted a pipe bomb in a trash can along the anticipated route of the Seaside Semper Five Marine Corps Charity 5K Race. (PSR ¶ 18.) The bomb was wired to a cellphone timer that the defendant had set to go off at 9:30 a.m. – approximately 30 minutes after the race was scheduled to begin. The bomb went off as planned. However, the start of the race had been delayed, and when the bomb detonated, the racers were still at the starting line. Had the race started on time, hundreds of runners would have been passing by when the defendant's bomb went off.

Later on September 17, the defendant left his home in Elizabeth and traveled to New York City. He brought with him eight additional bombs he had constructed. He built two of the bombs from pressure cookers, packed them with explosive chemicals, ball bearings, and other metal shrapnel, and wired them to cellphone timers. He made the other bombs from metal pipes and plastic bottles, filled them with explosive powder, and placed them inside a backpack, ready to deploy at any time.

The defendant took a train from New Jersey to Penn Station in Manhattan, carrying his bombs on the train and through the crowded station, and then made his way to the Chelsea neighborhood. At approximately 8:00 p.m., he planted a pressure-cooker bomb in the vicinity of 135 West 23rd Street, right outside a home for the blind and disabled. (PSR ¶ 20.) The bomb detonated approximately 30 minutes later. It propelled a nearby dumpster more than 120 feet, landing next to a woman who had been knocked over in the blast. The bomb sent shrapnel and debris hundreds of feet in every direction, shattering windows, knocking down scaffolding, and tearing through cars on the street. The force of the explosion knocked passersby off their feet. Metal ball bearings and other shrapnel tore through people's skin, lodging in their chests, legs, and eyes. Thirty-one people were injured in the blast. (PSR ¶ 21.)

Minutes after the defendant's bomb exploded on 23rd Street, he planted another pressure-cooker bomb approximately four blocks away, on West 27th Street. (PSR ¶ 23.) This bomb was later discovered by an alert citizen, who reported it to the police before it exploded. Law enforcement defused the device, removed it from the street, and rendered it safe. Subsequent analysis revealed numerous lethal components, including an extremely volatile mixture of homemade chemicals and a sheet of ball bearings and other shrapnel designed to kill and maximize human injuries.

On September 18, 2016, the morning after planting his bombs in Chelsea, the defendant made his way back to New Jersey by train. He carried the backpack containing his six remaining bombs. The backpack was later located near the entrance to the New Jersey Transit station in Elizabeth. (PSR ¶ 24.) One of the bombs detonated early on the morning of September 19 as a law enforcement officer attempted to defuse it.

The following morning, September 19, the owner of a bar in Linden, New Jersey reported a man sleeping inside the vestibule to his building. (PSR ¶ 31.) One of the officers who responded to the area recognized the defendant and began to speak to him. As they conversed, the defendant pulled a nine-millimeter Glock pistol from his jacket and shot the officer in the abdomen. (PSR ¶ 32.) The officer shot back and the defendant fled, shooting at other officers as he did. One of the defendant's bullets fragmented when it hit the windshield of a police car and struck an officer in the face. The police returned fire, wounded the defendant, and took him into custody. (PSR ¶ 33.) The officers recovered from the defendant the Glock pistol and a fanny pack containing approximately 40 rounds of live ammunition. (PSR ¶ 34.)

While the defendant was receiving medical treatment, law enforcement recovered from his pants pocket a notebook that contained a handwritten letter the defendant directed to the "USA Governmen[t]." (PSR ¶ 36; GX 703-1.) In the letter, the defendant claimed responsibility for his attack and set forth his justifications for it. He wrote that he had "prayed to the Beautiful wise Allah [] to not take Jihad away from" him. He warned that he was on a mission to "attack the kuffar [or non-believers] in their backyard." The defendant wrote that he had received "guidance" from Bin Laden and that al-Awlaki "had spoken the truth." He lauded Mohammed al-Adnani, a former senior leader of ISIS, and Nidal Hasan, a U.S. Army psychiatrist who shot and killed 13 people at Foot Hood military base, Kileen, Texas, in November 2009.

The defendant concluded the letter by making explicit his deadly plan: "Inshallah [or God willing] the sounds of bombs will be heard in the streets. Gun shots to your Police. Death to your OPPRESSION." (GX 703-1.)

5

### B. The Jury Verdict

On October 16, 2017, the defendant was convicted at trial of all eight counts in the Indictment. Specifically, the defendant was convicted of (i) use of a weapon of mass destruction at 23rd Street, in violation of 18 U.S.C. § 2332a; (ii) attempted use of a weapon of mass destruction at 27th Street, in violation of 18 U.S.C. § 2332a; (iii) bombing a place of public use at 23rd Street, in violation of 18 U.S.C. § 2332f; (iv) destruction of property by means of fire or explosive at 23rd Street, in violation of 18 U.S.C. § 844(i); (v) attempted destruction of property by means of fire or explosive at 27th Street, in violation of 18 U.S.C. § 844(i); (vi) interstate transportation and receipt of explosives, in violation of 18 U.S.C. § 844(d); (vii) use of a destructive device during and in furtherance of a crime of violence, in connection with the 23rd Street bombing, in violation of 18 U.S.C. § 924(c); and (viii) use of a destructive device during and in furtherance of a crime of violence, in connection with the 27th Street attempted bombing, in violation of 18 U.S.C. § 924(c).

### C. The Defendant's Conduct While Incarcerated

Beginning in at least October 2017, while incarcerated at the Metropolitan Correction Center (the "MCC"), the defendant attempted to radicalize other inmates by, among other things, distributing extremist materials. (PSR ¶¶ 15, 16.) The defendant provided these inmates access to and copies of terrorist propaganda and jihadist materials – some of which are described above – that had been located on electronic devices during the investigation in this case and copies of which the Government produced to the defendant in discovery. The defendant also met with some of those inmates during the MCC's Friday *juma* prayer. The materials the defendant distributed included, among other things, speeches and lectures by al-Awlaki and Bin Laden; the Book of Jihad; bomb-making instructions; *nasheeds* espousing jihadist ideology; and various issues of

*Inspire* magazine. The defendant allowed the inmates to view these materials on his laptop, and also gave some of them electronic copies. For example, MCC staff confiscated a hard drive from a locker assigned to Sajmir Alimehmeti – a defendant charged in this District with, *inter alia*, providing material support and resources to ISIS (*see United States v. Alimehmeti*, 16 Cr. 398 (PAE)) – that contained copies of *Inspire* that had been produced to the defendant (but not Alimehmeti).

After learning of the defendant's radicalization efforts, the MCC staff searched his personal property and located, among other things, an address book containing the names and inmate numbers of other defendants charged with terrorism offenses, including Muhanad Mahmoud Al-Farekh, who was recently convicted in the Eastern District of New York for participating in an attack on a U.S. Army base in Afghanistan in 2009 (*see United States v. Mahanad Mahmoud Al-Farekh*, 15 Cr. 268 (BMC)), and Maalik Alim Jones, who recently pled guilty in this District to charges stemming from his involvement fighting with al-Shabaab in Somalia (*see United States v. Maalik Alim Jones*, 16 Cr. 19 (PGG)). (PSR ¶ 16.) In addition to the address book, MCC staff found a notebook that included several pages itemizing particular electronic files of terrorist propaganda materials.

### D. The Presentence Investigation Report

On January 5, 2018, the Probation Office submitted its final PSR in this case. The Probation Office calculated a total offense level of 43, as follows: (1) Counts One, Three, Four, and Six, all of which relate to the 23rd Street bombing, are grouped, with a total offense level of 56, including a 12-level enhancement because the offenses involved federal crimes of terrorism (U.S.S.G. § 3A1.4(a)), and a two-level enhancement for obstruction of justice (U.S.S.G. § 3C1.2);

(2) Counts Two, Five, and Six, all of which relate to the 27th Street bombing, are grouped, with a total offense level of 56, including the same terrorism and obstruction of justice enhancements; (3) two levels are added because each group constitutes a single unit under the United States Sentencing Guidelines; and (4) pursuant to Chapter 5, Part A of the Guidelines, because the total offense level is in excess of 43, the offense level will be treated as a level 43. (PSR ¶¶ 46-63.) The PSR further found the applicable Criminal History Category to be VI, pursuant to U.S.S.G. § 3A1.4(b), because the offense involved, or was intended to promote, a federal crime of terrorism. (PSR ¶ 66.)

Accordingly, the Guidelines imprisonment range is life. (PSR ¶ 95.) Because the defendant was convicted on Counts Seven and Eight, the statutory mandatory minimum term of imprisonment is also life. *See* 18 U.S.C. §§ 924(c)(1)(A) and (B)(ii).

### III. DISCUSSION

The defendant carried out a terrorist attack in the heart of New York City. Thankfully, by some miracle, no one was killed. But the evidence established that the defendant intended and designed his attack to kill as many people as possible. He was guided by terrorist leaders and groups responsible for some of the worst atrocities against Americans in recent history. Following step-by-step instructions from these groups, he meticulously constructed nine bombs, all of which he designed to maximize fatalities and injuries to humans. He carried those bombs through New Jersey, onto commuter trains, and into the streets of Manhattan. He deliberately planted them in locations he knew would be crowded with people: a charity race with hundreds of participants, the busy streets of Chelsea on a Saturday evening, and a crowded train station during the Monday morning commute. And after his bombs went off, the defendant attempted to murder the police

8

officers who risked their lives to end his campaign of terror.  Accordingly, the only appropriate sentence in this case, and the only sentence that will adequately achieve specific deterrence, general deterrence, protection of the public, and promotion of respect for the law under 18 U.S.C. § 3553(a), is the sentence required by statute:  life in prison.

As the evidence at trial demonstrated, the defendant was committed to waging his holy war against Americans years before he carried out his attack.  Even today, he appears to remain steadfast in that commitment and has shown no remorse.  The best evidence of these sentiments is the defendant's efforts to distribute terrorist propaganda and radicalize inmates within the MCC.  The defendant's communications while incarcerated further demonstrate that, far from appreciating the depravity of his actions, he is proud of what he did, scornful of the American justice system, and as dedicated as ever to his terrorist ideology.  For example, during a call with a family member while trial was proceeding, the defendant bragged:

> [Another inmate] asked me how are we going to watch the news and I told him I don't need to watch the news because I am the news [Laughs]. . . .
>
> By the way the[ Government] brought the pressure cooker in the court and they showed to the people how I used the pressure cooker and how I was an expert.  I was telling my lawyer that my mother was saying that her pressure cookers were taken from the house and she has no pressure cookers of her own now [Laughs] so I told the lawyer to get those brand-new pressure cookers to my mother.  They had new pressure cookers in the court. . . .  Since they took your pressure cookers then they can return them back to you.  I told her to send them to you guys.

Ex. C (Prison Call Transcript) at 3, 7.  And in a December 12, 2017 letter to an associate in Germany, the defendant wrote:

> As trial was coming to an end they gave me time to think about if I wanted to take the stand in my defense.  I wanted to make a

9

> statement but decided not to.  I made a dua, My statement to Allah was My Judge is a kaffir, my lawyer is a kaffir, my prose[c]utor is a kaffir, and my jury are all kaffirs.  Who among them will understand the Muslim problem.  Their hands are already drenched with Muslim Blood and how will they understand our struggle.  So my Dua to Allah was that on the Day of Judg[]ment you bring back together with everyone from this Court Room then I will give my statement.  Where Allah will be my Judge.

Ex. D (Dec. 12, 2017 Letter) at 1-2.

The defendant's jokes about the items he used to construct his deadly devices, his pride in being "an expert" bombmaker, and his dismissal of the legitimacy of this proceeding make clear that he does not acknowledge the horrific nature of his crimes.  He does not regret the harm he caused his victims, the people of New York and New Jersey, or his family.  Instead, he continues his attempt to wage *jihad* from his prison cell, espousing the hatred and vitriol of the terrorists he emulated in carrying out his attacks.  His conduct reflects a complete lack of respect for the law and indicates that he has not been deterred, but rather emboldened.

The mandated sentence of life imprisonment is the only appropriate sentence in this case.  It is the only sentence that will provide sufficient punishment for the defendant's crimes and adequate justice for the victims of the defendant's attack.  It is the only sentence that will appropriately reflect the seriousness of the defendant's actions.  It is the only sentence that will protect the public from the defendant's continued depravity and make clear to those who consider following his path that acts of terror are punished swiftly and severely.

## IV. CONCLUSION

For these reasons, the Government respectfully submits that a sentence of life imprisonment is necessary, appropriate, and required in this case. In addition, the Government respectfully requests that the Court order that the defendant pay $562,803.03 in restitution to the victims of the defendant's offenses. A proposed order of restitution is attached hereto as Exhibit E.

Dated: New York, New York
       January 16, 2018

                   Respectfully submitted,

                   GEOFFREY S. BERMAN
                   United States Attorney
                   Southern District of New York

            By:  /s/
                   Emil J. Bove III
                   Shawn G. Crowley
                   Andrew J. DeFilippis
                   Assistant United States Attorneys

Cc: Defense Counsel
   (Via ECF)